# Docket and File

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RECEIVED
2014 OCT -7 P 4 53
U S DISTRICT COURT SDNY

| | |
|---|---|
| IN RE:<br><br>*SOUNDVIEW ELITE et al*<br>Debtors. | Chapter 11<br><br>Case No. 14-cv-7666 (JPO) |
| ALPHONSE FLETCHER, JR. (*pro se*),<br>Appellants.<br><br>v.<br><br>CORINNE BALL, as Chapter 11 Trustee of<br>SOUNDVIEW ELITE, *et al.*<br>Appellees. | *On Appeal from the United States*<br>*Bankruptcy Court for the*<br>*Southern District of New York*<br>*(Honorable Robert E. Gerber)* |

## ORAL ARGUMENT REQUESTED

## APPELLANT ALPHONSE FLETCHER'S OPENING BRIEF

This is an appeal of a part of a Bankruptcy Court order ("Order") denying a motion ("Motion") to remove a chapter 11 Trustee ("Motion to Remove Chapter 11 Trustee, Dismiss this Action, and Other and Further Relief" Docket No. 306). Alphonse Fletcher, Jr., *pro se*, joined ("Joinder"), in part, in the Motion ("Alphonse Fletcher, Jr.'s Joinder in Part in the Chapter 11 Trustee's Objection to the Motion to Dismiss and in the Muho Motion to Remove the Chapter 11 Trustee" Docket No. 302). The Bankruptcy Court denied the Motion on August 7, 2014. Each of the court-appointed fiduciaries serving *Soundview Elite et al* ("Soundview Fiduciaries") represented to the Court that it had "disclose[d] all facts" and connections. No connection could be hidden that "would even faintly color the independence and impartial attitude required by the Code and Bankruptcy Rules." The Soundveiw Fiduciaries, however, hid and even denied representations of and connections to the estate's primary adversaries, parties associated with defendants in a civil rights lawsuit[1] who vowed to "destroy" the plaintiffs and their affiliates including Sounview Elite, Fletcher International, Ltd., and related funds. Fiduciaries with connections to such parties could have interests "consistent with Defendant Barnes' threat to Fletcher in June 2010 that if Fletcher went ahead and vindicated his rights by filing this lawsuit, the [Dakota] Board would do everything in its power to destroy Fletcher and his reputation in the business community."

2014 OCT 30 P 12 36
RECEIVED
PRO SE CLERK'S OFFICE

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10/7/14

# TABLE OF CONTENTS

TABLE OF AUTHORITIES     v

JURISDICTIONAL STATEMENT     ix

STATEMENT OF THE ISSUES     ix

STANDARD OF REVIEW     x

STATEMENT OF THE CASE     x

STATEMENT OF THE FACTS     1

     Summary of the Facts     1

     Jones Day Client Angelo, Dakota Inc., Civil Rights Litigation, and Retaliation     1

     Jones Day Client Ernst & Young and Its Examaintion of The Fletcher Funds     2

     Dakota Counsel Quinn Emanuel's Public Strategy     3

     Angelo/Dakota Involvement Cayman Island Wind Up Proceedings     4

     Chapter 11 Proceedings of Affiliates Soundview Elite Ltd et al     5

     Soundview Fiduciaries and Their Connections     7

SUMMARY OF THE ARGUMENT     9

ARGUMENT     11

     GOVERNING LAW.     11

        The Honorable Shelley C. Chapman's recent opinion succinctly highlights the issues. 11

        "Complete and truthful disclosure of all connections and fee arrangements must be made."     13

        Section 327(a) of the Bankruptcy Code.     13

        Disinterestedness.     14

        The Mandatory Duty of Professionals to Disclose Connections     16

           Bankruptcy Rule 2014(a).     16

Bankruptcy Rule 2016.                                                                                    17

The Professional's Duty to Disclose is Self-Policing.                                17

Courts Strictly Construe the Duty to Disclose.                                        19

The Duty To Disclose is Continuing.                                                      20

Failure to Disclose Has Serious Consequences.                                      21

Court May Allow Reasonable Compensation To Retained Professionals From the
Estate Upon Proper Application With Requisite Disclosure.                      22

Section 330(a)(1) of the Bankruptcy Code.                                          22

Section 329 of the Bankruptcy Code.                                                  22

Section 330(a)(5) of the Bankruptcy Code.                                          23

The Court May Vacate Its Own Retention Orders and Order Full Disgorgement Where
There Has Been A Fraud Perpetrated Upon The Court.                          23

Civil Rule 60(b) – Generally.                                                              23

Civil Rule 60(b)(6).                                                                            24

Civil Rule 60(d)(3).                                                                            25

The Court's Inherent Power To Impose Sanctions.                                  27

The Fiduciaries failed to make complete and candid disclosure.              28

Undisclosed and Partially Disclosed Conflicts that Preceded the June 29, 2012 Filing
of Bankruptcy for FILB                                                                      28

The Fiduciaries' Lack of Disinterest                                                    28

The Protection of the Integrity of the Bankruptcy System Requires Vacateur of
Appointment Orders  of and Disgorgement of Fees from Ms. Ball and her advisors.  29

The Court, Pursuant to Fed. R. Civ. P. 60(b)(6) and 60(d)(3), Made Applicable by Fed.
R. Bankr. P. 9024, Should Vacate the Retention Orders of Luskin and Goldin          30

The Court Should Order the Removal of Ms. Ball as Chapter 11 Trustee, Jones Day as
Trustee Counsel, and Kinetic as Financial Advisor and Order Disgorgment of all Fees
30

Continuing Misrepresentations by the Fiduciaries                                  30

**CONCLUSION**                                                                              **32**

# TABLE OF AUTHORITIES

**Cases**

Andrada Fin., LLC v. Humana Group, Inc. (In re Andrada Fin. LLC), No. AZ-10-1209- -JuMkPa, 2011
WL 3300983 (9th Cir. BAP)

Andrulonis v. United States, 26 F.3d 1224 (2d Cir.1994)

Balco Equities Ltd. v. Cohen, Estis and Assocs., LLP (In re Balco Equities Ltd.),
345 B.R. 87 (Bankr. S.D.N.Y. 2006)

Bank Brussels Lambert v. Coan (In re AroChem Corp.), 176 F.3d 610 (2d Cir. 1999)

Birnbaum v. Birnbaum, 73 N.Y.2d 461 (1989)

Demjanjuk v. Petrovsky, 10 F.3d 338 (6th Cir. 1993)

Diamond Lumber Inc. v. Unsecured Creditors' Comm., 88 B.R. 773 (N.D. Tex. 1988)

Freedom, N.Y., Inc. v. United States, 438 F.Supp.2d 457 (S.D.N.Y. 2006)

Futuronics Corp. v. Arutt, Nachamie and Benjamin (In re Futuronics Corp.),
655 F.2d 463 (2d Cir. 1981)

Goldberg v. Vilt (In re Smith), 397 B.R. 810 (Bankr. E.D. Tex. 2008)

Hazel Atlas Glass Co. v. Harford-Empire Co., 322 U.S. 238 (1944)

I.G. Petroleum, L.L.C. v. Fenasci (In re W. Delta Oil Co.).

In re ACandS, Inc., 297 B.R. 395 (Bankr. D. Del. 2003)

In re Adams, 229 B.R. 312 (Bankr. S.D.N.Y. 1999)

n.44 In re AMC Realty Corp., 270 B.R. 132 (Bankr. S.D.N.Y. 2001).

In re Angelika Films 57th, Inc., 227 B.R. 29 (Bankr. S.D.N.Y. 1998)

In re B.E.S. Concrete Prods., Inc., 93 B.R. 228 (Bankr. E.D. Cal. 1988)

In re BH & P, Inc., 949 F.2d 1300 (3d Cir. 1991)

*In re Big Rivers Elec. Corp..,* 355 F.3d 415, 428 (6th Cir. 2004)

In re Caldor, Inc., 193 B.R. 165 (Bankr. S.D.N.Y. 1996)

In re C&C Demo, Inc., 273 B.R. 502 (Bankr. E.D. Tex. 2001)

In re Codesco, Inc., 15 B.R. 351 (Bankr. S.D.N.Y. 1981)

In re Codesco, Inc., 18 B.R. 997 (Bankr. S.D.N.Y. 1982)

In re Drake, 7 F. Cas. 1046 (D.N.J. 1876)

In re Egwu, No. 10-30652 (RAG), 2012 WL 5193958
(Bankr. D. Md. Oct. 19, 2012).

In re Enron Corp., 352 B.R. 363 (Bankr. S.D.N.Y. 2006)

In re eToys, Inc., 331 B.R. 176 (Bankr. D. Del. 2005)

In re FairPoint Commc'ns, Inc., 445 B.R. 271 (Bankr. S.D.N.Y. 2011)

In re Fibermark, Inc., No. 04-10463, 2004 WL 723495 (Bankr. D. Vt. Mar. 11, 2006)

In re Futuronics Corp., 5 B.R. 489 (SDNY 1980)

In re Granite Partners, L.P., 219 B.R. 22 (Bankr. S.D.N.Y. 1998)

In re GSC Group, Inc. No. 10-14653 (AJG), 2012 WL 676409 (Bankr. S.D.N.Y. Feb. 29, 2012)
    In re Ira Haupt & Co., 361 F.2d 164 (2d Cir. 1996)
    In re Jore, 298 B.R. 703 (Bankr. D. Mo. 2003)
    In re Kewriga, No. 01-44262, 2002 WL 484942 (Bankr. D. Mass. Mar. 28, 2002)

In re Leslie Fay Cos., 175 B.R. 525 (Bankr. S.D.N.Y. 2002)

In re Levander 180 F.3d 1114 (9th Cir. 1999)

In re Lewis Road, LLC,, No. 09-37672, 2011 WL 6140747
    (Bankr. E.D. Va. Dec. 9, 2011)

In re Matco Elecs. Group, Inc., 383 B.R. 848 (Bankr. N.D.N.Y. 2008)
    In re Mercury, 280 B.R 35 (Bankr. S.D.N.Y. 2002)
    In re MF Global, Inc., 464 B.R. 594 (Bankr. S.D.N.Y. 2011)

In re Old Cargo, LLC, 423 B.R. 40 (Bankr. S.D.N.Y. 2010)

In re Park-Helena Corp., 63 F.3d 877 (9th Cir. 1995)

In re Plumeri, No. 10-10050 (MG), 2010 WL 3087685
    (Bankr. S.D.N.Y. Mar. 25, 2010)

In re Project Orange Assocs., LLC, 431 B.R. 363 (Bankr. S.D.N.Y. 2010)

In re Roberts, 46 B.R. 815 (Bankr. D. Utah 1985)
    In re Rockaway Bedding, Inc., 454 B.R. 592 (Bankr. D.N.J. 2011)
    In re Roger J. Au & Son, Inc., 71 B.R. 238 (Bankr. N.D. Ohio 1986)

In re Soulisak, 227 B.R. 77 (Bankr. E.D. Va. 1998)

In re Source Enters., Inc., No. 06-11707 (AJG), 2008 WL 850229
    (Bankr. S.D.N.Y. Mar. 27, 2008)

In re St. Joseph Cleaners, Inc., 346 B.R. 430 (Bankr. W.D. Mich. 2006)

In re Teligent, Inc., 326 B.R. 219 (S.D.N.Y. 2005)

In re United Cos. Fin. Corp., 241 B.R. 521 (Bankr. D. Del. 1999)

In re Vebeliunas, 231 B.R. 181 (Bankr. S.D.N.Y. 1999)

In the Matter of Arlan's Dep't Stores, Inc., 615 F.2d 925 (2d Cir. 1979)

King v. First Am. Investigations, Inc., 287 F.3d 91 (2d Cir. 2002)

Kravit, Gass & Weber, S.C. v. Michel (In re Crivello), 134 F.3d 831
    (7th Cir. 1998)

Kupferman v Consolidated Research and Mfg. Corp., 459 F.2d 1072
    (2d Cir. 1972)

Lamie v. United States Trustee, 540 U.S. 526 (2004)

LeBoeuf, Lamb, Greene & McCrae, L.L.P. v. Worsham, 185 F.3d 61 (2d Cir. 1999)

Lee v. Marvel Enters., 765 F.Supp.2d 440 (S.D.N.Y. 2011)

Lubit v. Chase (In re Chase), 372 B.R. 142 (Bankr. S.D.N.Y. 2007)

Mapother & Mapother, P.S.C. v. Cooper (In re Downs), 103 F.3d 472 (6th Cir. 1996)

Marrero Pichardo v. Ashcroft, 374 F.3d 46 (2d Cir. 2004)

Martina Theatre Corp. v. Schine Chain Theatres, Inc., 278 F.2d 798 (2d Cir. 1960)

Matarese v. LeFevre, 801 F.2d 98 (2d Cir. 1986)

Matter of Olsen Indus., Inc., 222 B.R. 49 (Bankr. D. Del. 1997)

Meinhard v. Salmon, 249 N.Y. 458 (1928)

Nemaizer v. Baker, 793 F.2d 58 (2d Cir. 1986)

Pearson v. First NH Mort. Corp., 200 F.3d 30 (1st Cir. 1999)

Philips Lighting Co. v. Schneider, 395 F. App'x 796 (2d Cir. Oct. 12, 2010)

Radack v. Norwegian Am. Line Agency, Inc., 318 F.2d 538 (2d Cir. 1963)

Reilly v. Natwest Markets Group, Inc., 181 F.3d 253 (2d Cir. 1999)

Rome v. Braunstein, 19 F.3d 54 (1st Cir. 1994)

Specker Motor Sales Co. v. Eisen, 393 F.3d 659 (6th Cir. 2004)

Standard Oil Co. of Cal. v. United States, 429 U.S. 17 (1976)

United States v. Seltzer, 227 F.3d 36 (2d Cir. 2000)

United States v. Smiley, 553 F.3d 1137 (8th Cir. 2009)

Vouzianas v. Ready & Pontisakos (In re Vouzianas), 259 F.3d 103 (2d Cir. 2001)

Weldon v. U.S., 225 F.3d 647, No. 99-6142, 2000 WL 1134358 (2d Cir. Aug. 9, 2000)

Workman v. Bell, 227 F.3d 331 (6th Cir. 2000)

| Statutes - Federal | Rules-Federal |
|---|---|
| 11 U.S.C. § 101(14)(A) | Fed. R. Bankr. Fed. R. Bankr. Fed. R. Bankr. Fed. R. Bankr. Fed. R. Bankr. |
| 11 U.S.C. § 101(14)(C). | |
| 11 U.S.C. § 101(41) | Fed. R. Bankr. P 2014 |
| 11 U.S.C. § 105(a) | Fed. R. Bankr. P. 2016 |
| 11 U.S.C. § 326 | Fed. R. Bankr. P. 2017 |
| 11 U.S.C. § 327 | Fed. R. Bankr. P. 7030 |
| 11 U.S.C. § 328 | Fed. R. Bankr. P. 7034 |
| 11 U.S.C. § 329 | Fed. R. Bankr. P. 9024 |
| 11 U.S.C. § 330(a)(1) | |
| 11 U.S.C. § 330(a)(3) | Fed. R. Civ. P. 30 |
| 11 U.S.C. § 330(a)(5) | Fed. R. Civ. P. 34 |
| 11 U.S.C. § 503(b)(2) | Fed. R. Civ. P. 60(b)(3) |
| 11 U.S.C. § 503(b)(4) | Fed. R. Civ. P. 60(b)(6) |
| 11 U.S.C. § 504(a) | Fed. R. Civ. P. 60(c)(1) |
| 11 U.S.C. § 507(a)(2) | Fed. R. Civ. P. 60(d) |
| 11 U.S.C. § 1103 | Fed. R. Civ. P. 60(d)(3) |
| 11 U.S.C. § 1107 | |
| 11 U.S.C. § 1108 | |
| 28 U.S.C. § 1927 | |
| 28 U.S.C. § 1746 | |

**Statutes-State**

N.Y. Est. Powers & Trusts Law § 7-2.6(a)(2)

# JURISDICTIONAL STATEMENT

This is an appeal of a part of an Bankruptcy Court order ("Order") denying a motion ("Motion") to remove a chapter 11 Trustee ("Motion to Remove Chapter 11 Trustee, Dismiss this Action, and Other and Further Relief" Docket No. 306). Alphonse Fletcher, Jr., *pro se,* joined ("Joinder"), in part, in the Motion ("Alphonse Fletcher, Jr.'s Joinder in Part in the Chapter 11 Trustee's Objection to the Motion to Dismiss and in the Muho Motion to Remove the Chapter 11 Trustee" Docket No. 302). The Bankruptcy Court denied the Motion on August 7, 2014. Fletcher appealed on August 21, 2014. Fletcher filed his Designation of the Items to be Included in the Record on Appeal and a Statement of Issues to be Presented on Appeal on September 3, 2014. The District Court has jurisdiction to hear this appeal pursuant to 28 U.S.C. §158(a)(1) and Federal Rules of Bankruptcy Procedure 8001, *et seq.*

## STATEMENT OF THE ISSUES

Whether the Bankruptcy Court committed an error of law or an abuse of discretion or exceeded its discretion, under Bankruptcy Codes and Rules including Code 327 and Rule 2014, in not disqualifying and removing a chapter 11 trustee ("Trustee"), his counsel ("Trustee's Counsel") and his financial advisor ("Financial Advisor," the three together, "Fiduciaries") serving the jointly administered debtors ("Debtors") after being put on notice that those Fiduciaries currently represent and previously represented,

1. parties-in-interest in those proceedings including various parties actually or potentially adverse to the Debtors, or affiliates of such parties;

2. parties affiliated with defendants ("Civil Rights Defendants") in civil rights litigation brought by affiliates of the Debtors in circumstances in which the Civil Rights Defendants unlawfully retaliated by promising to and taking actions intended to "destroy" the plaintiffs and the plaintiff's affiliated funds, including the Debtors, according to the civil rights lawsuit's complaint.

## STANDARD OF REVIEW

This District Court, vested with the appellant jurisdiction over the ruling of the Court pursuant to 28 U.S.C. §158(a)(1), reviews the legal conclusions of the Court and may reverse the Court's extraordinary remedy. Mixed questions of facts and law are reviewed either *de novo* or under clearly erroneous standards depending on weather the question is predominately legal or factual.

## STATEMENT OF THE CASE

This is an appeal of a part of an August 7, 2014 Bankruptcy Court order ("Order") denying a motion ("Motion") to disqualify and remove a chapter 11 Trustee, a motion. Appellant Fletcher's Joinder (Docket No. 302). identified a lack of disclosure of interests adverse to the estate (11 U.S. Code § 327(a) - Employment of professional persons) and connections with the debtor (Rule 2014 - Employment of Professional Persons) as it applies to chapter 11 trustee (the "Trustee") appointed in *Soundview Elite, Ltd. et al* (the "Estates"), her counsel Jones Day ("Jones Day"), and her financial advisor Kinetic Partners ("Kinetic"). The Trustee, Jones Day, and Kinetic (together, "Soundview Fiduciaries") filed to disclose their connections to defendants in a civil rights litigation ("Civil Rights Defendants") accused of promising to "destroy" the Civil Rights plaintiffs' and their affiliates in unlawful retaliation.

# STATEMENT OF THE FACTS

## Summary of the Facts

Assets of offshore private investment fund Fletcher International, Ltd., which despite extraordinary circumstances realized more than $150 million of profits between January 1, 2007 and June 30, 2012 according to the its Fletcher International Ltd. trustee's schedules, were transferred through "settlements" to parties affiliated with its adversaries who had threatened to "destroy" its founder and its affiliates. Now a chapter 11 trustee and her advisors appointed to serve as fiduciaries over estates that hold significant interests in Fletcher International, Ltd. have not disclosed their connections to many of those same adverse parties.

## Jones Day Client Angelo, Dakota Inc., Civil Rights Litigation, and Retaliation

In 2007, as president of the board of Dakota, Inc,. a Manhattan cooperative apartment building where Alphonse Fletcher lived for two decades, Alphonse Fletcher opposed conduct that was anti-semitic, racist, and unlawful.

In response, between 2007 and 2010 certain officers of Dakota Inc. repeatedly threaten to destroy the investment business Alphonse Fletcher founded in 1991 including the private investment fund Fletcher International, Ltd.

By 2010, the retaliation had escalated to include adverse actions taken by law firms including Quinn Emanuel and Paul Weiss and other agents and entities, such as News Corporation, Sotheby', Credit Suisse, and JPMorgan Chase, affiliated with certain Dakota Inc. shareholders ("Angelo/Dakota Parties"). The unlawful retaliation included interference with investors in and investments of Fletcher and its affiliates and witnesses.

In February 2011, Alphonse Fletcher and Fletcher Asset Management, Inc. sued certain of the Angelo/Dakota Parties ("*Fletcher v Dakota*") for breach of fiduciary duty, tortious interference, defamation, retaliation, discrimination, and other torts and in response the Angelo/Dakota Parties escalated their retaliation.

On July 22, 2011, the Louisiana Officials entered into a Non-Disclosure Agreement.[2]  The
agreement allowed the Louisiana Officials' accounting firm, Ernst & Young, to conduct an in depth
analysis of the Fletcher funds in response to derogatory statements and articles by News
Corporation reporters including demonstrably fabricated quotes.[3]  In the Non-Disclosure
Agreement, the Louisiana Officials promised not to provide confidential information relating to
Fletcher International, Ltd. and its affiliates to

> "the Dakota co-op board, Quinn Emanuel Urquhart & Sullivan,
> LLP… or to any director, officer, member, partner, associate,
> employee or any other affiliate or person related to such entities."


## Jones Day Client Ernst & Young and Its Examaintion of The Fletcher Funds

Beginning on July 28, 2011, the Louisiana Officials announced that the Ernst & Young
review of Fletcher and the fund in which they invested, FIA Leveraged Fund ("FIAL") was
successful.

July 28, 2011:  FIAL is being "completely open and forthcoming" and FIAL "has
assets exceeding the value of the [Louisiana Pension Funds] investments and
earnings showing more than $40 million in profit on the [pension funds] original
investment."  http://lafirefightersret.com/pdf/7-28-11-JOINT-STATEMENT.pdf

August 18, 2011:  "To this point the management and staff of FAM have been open
and forthcoming with the documents requested by the team. FAM representatives
freely discussed any subject raised by the team. The firm that provides a valuation of
investments managed by FAM is comprised of a well respected, independent team of
academics. Independent valuations have been used to value the assets in preparing
prior audits of the funds in accordance with generally accepted accounting
principles." http://lafirefightersret.com/pdf/memo-to-members.pdft

September 9, 2011:  The review was conducted with "a principal in the investigation
and dispute services unit of Ernst & Young accounting firm...The assets and their
valuations have now been corroborated."  [See statement which the three pension
funds  distributed selectively rather than posting on their websites.]

August 14, 2011:  Fredieu, the chair of the Firefighters' Retirement System who
initially questioned the arrangement with Fletcher, said that if the preliminary
investigation into the hedge fund's assets holds true, the deal will remain "our best
investment since I've been on the board."  "Normally, we don't like to make a hasty
decision," he said, "but in that particular case, the hasty decision paid off." http://
www.nola.com/business/index.ssf/2011/08/louisiana_pension_fund_may_rue.html

September 8, 2011: Steven Stockstill, director of the Firefighters' Retirement System, said in an interview after the closed-door meeting that Fletcher "has the assets in place" to cover the original investment, according to the accounting firm, which is set to issue a final report to Stockstill in the next week. http://www.nola.com/business/index.ssf/2011/09/hedge_fund_appears_to_have_eno.html

September 8, 2011: Robert Rust, administrative director of the Municipal Employees' Retirement System, said the findings left him "comfortable that there are assets there and that the assets are in excess of our investments."... Fund officials said discretion was necessary avoid disclosing information about securities the hedge fund has invested in.  http://www.nola.com/business/index.ssf/2011/09/hedge_fund_appears_to_have_eno.html

## Dakota Counsel Quinn Emanuel's Public Strategy

On August 3, 2011, the Louisiana Officials asked Alphonse Fletcher why Angelo/Dakota Party Quinn Emanuel was contacting them about our fund, "Who is this law firm? Why would they have an interest in this matter?" He responded, "Quinn Emanuel, represents The Dakota and is well known in New York for its "Public Strategy" tactics (please see the below page from Quinn's web site). *The Wall Street Journal* appears to be working with them" and included the below page from Quinn Emanuel's website:

"Public Strategy in High Profile Litigation: Media Relations

High profile legal disputes can become politicized and the subject of intense media attention. Public statements, court filings and testimony can impact both potential jurors and government officials, can shape settlement issues and obviously and dramatically affect other business objectives. In many of the "bet the farm" cases that our firm specializes in, success in the court of public opinion is as important as —or can contribute to—success in the court of law.

Our experience and that of our clients in California, New York, and abroad has been that it is very difficult to find public relations firms which can operate effectively in the context of such complex and contentious legal disputes. Washington is full of lobbyist-lawyers, but even the best of them are not effective outside of the beltway. And outside of Washington, most of those who hold themselves out as providing strategic advice lack the necessary skills to do so in the context of an investigation or complex litigation; they do not understand the legal imperatives and cannot effectively package the issues involved.

Quinn Emanuel has lawyers who have special expertise and experience in coordinating litigation and communication strategies. We are prepared to offer strategic counseling not only to deal with crises but also to prevent them. We have decades of experience training CEOs and top executives in presenting issues to the public, dealing with government investigations, guiding public relations staffers and

consultants, and aggressively pursuing communications and political efforts in a way that both supports and protects our clients' legal and business interests. And because we are lawyers, to the extent our work is done in the context of providing legal advice, it can be done in confidence."

In or about January 2012, Angelo/Dakota Parties' counsel, began representing Louisiana state officials ("Louisiana Officials") responsible for three pension funds invested in preferred stock of Fletcher's affiliate FIA Leveraged Fund despite the July 22, 2011 agreement.


**Angelo/Dakota Involvement Cayman Island Wind Up Proceedings**


After the Louisiana Officials, which had been redeemed with a distribution of the United Option securities, joined with the Angelo/Dakota Parties to seize control of FIA Leveraged Fund through a Cayman Wind Up proceeding in which they were represented by the judge's personal counsel.[4] In April 2012, one of the Louisiana Officials' new counsel that included the Chief Justice as one of his clients was granted an involuntary bankruptcy petition against Leveraged, despite disputes of material facts, in a summary proceeding before the Chief Justice.

The Chief Justice appointed the Louisiana Officials' financial advisor, Ernst & Young, as Leveraged's "independent" fiduciary ("Ernst & Young Liquidators") to be paid by the Louisiana Officials. Those officials demanded that Ernst & Young Liquidators seek to liquidate "all funds in the FAM silo."[5]

The court-appointed fiduciaries serving Fletcher International, Ltd. and the fiduciaries in the associated Soundview chapter 11 cases each have undisclosed connections to the Angelo/Dakota Parties and those associated with them. The Angelo/Dakota Parties appear to be interfering in those proceedings, related proceedings, media coverage, and business dealings of affiliates of the estates. On September 6, 2012, Mr. Marc E. Kasowitz, then counsel to Fletcher International, Ltd., Alphonse Fletcher, and Fletcher Asset Management, wrote to Dakota counsel[6]:

"Finally, it is beyond ironic that you point to a recent decision involving FAM fund investors and their fund's Chapter 11 filing as a supposed justification for illegal discrimination, retaliation and defamation by the Dakota and its directors. Plaintiffs have propounded discovery seeking revelation of all communications regarding them between the Dakota defendants (and their agents) and the press, plaintiffs investors, regulators and other third parties. While you point to actions by third parties as

4

evidence purportedly relevant to this case, at the same time you have refused to produce your communications with those same parties. Among other things, your stonewalling this discovery gives rise to the clear inference that the evidence will show that it is defendants' (and their agents') dissemination of false and defamatory information and wrongful interference in plaintiffs business, regulatory, and legal matters which have brought about the very incidents listed in your letter which you concede have damaged Mr. Fletcher and FAM."

In or about January 2013, the Fletcher International Fiduciaries entered into negotiations and reached understandings with certain Angelo/Dakota Parties, including the Ernst & Young Liquidators, to secure an agreement for additional compensation beyond that provided through the bankruptcy case. That compensation was eventually structured as fees for the chapter 11 trustee in a new position he would assume after confirmation,"Plan Administrator."

Since then fiduciaries and parties-in-interest cooperating between US and Cayman insolvency proceedings have removed substantial value from the estates with settlements that are not "arms-length," disregard for claims against "connected" parties, and allowing exaggerated claims made by connected parties. The Angelo/Dakota Parties have benefited and little value has survived for the estate.

In November 2013, the Fletcher International Fiduciaries released the "Trustee's Report and Disclosure Statement" for their "Plan of Liquidation." That plan provided the Ernst & Young Liquidators, Angelo/Dakota Parties, with the majority of the estate.

## Chapter 11 Proceedings of Affiliates Soundview Elite Ltd et al

On September 23, 2013, Fletcher fund affiliate Soundview Elite, Ltd. and five of its affiliates ("Soundview Debtors") filed for protection under chapter 11 in the Southern District of New York Bankruptcy Court as a result of the continuing unlawful retaliation. Later that day, Chief Justice Smellie granted wind up petitions filed by Citco[7] even though he was not the judge scheduled to hear the cases and the wind up proceeding was stayed by the chapter 11 filing. The Cayman Court of Appeals registrar then struck the the pending Privy Council appeal citing Campbells claim that the

$200,000 "security for costs" held in Cayman since August had been received two business days too late.[8]

In the Soundview chapter 11 proceedings, former Fletcher counsel Paul Weiss in *Fletcher v Dakota* represented Citco.[9] Soundview investors Pasig Ltd. was represented by Kasowitz Benson which had replaced Paul Weiss as counsel to Alphonse Fletcher and Fletcher Asset Management, Inc. until it too withdrew. Paul Weiss and Kasowitz Benson represented a Pasig when Pasig was adverse to their former client, Pasig was associated with the Angelo/Dakota Parties, the matters were related, and the law firms made arguments that contradict positions they took in their earlier representation.

On November 25, 2013, the Fletcher Trustee released his "Trustee's Report and Disclosure Statement." The Court required the Fletcher trustee to add a disclaimer to the start of the document clarifying that it contained unsubstantiated opinion and allowed objectors to include a supplement which contradicting much of the Report.[10] The report was released toward the end of the Soundview discovery period but Luskin Stern refused to provide any documents and warned Soundview's debtor's counsel not to try to call Mr. Davis for discovery or suffer the wrath of a "Watergate Prosecutor." The Soundview debtors' counsel stated on page 2 of its December 11, 2013 "Debtors' Memorandum of Law:"

> In a call by Debtors' counsel to Trustee's counsel on November 27, 2013, Trustee's counsel advised that he could not provide Debtors' counsel with the materials supporting the 579 footnotes which accompany the report, for two reasons: (i) because they are not separately organized in that order, and (ii) because "most of the stuff came from Fletcher anyway."

After a five day trial in December and January, Judge Gerber found "no fraud or incompetence" in the Soundview management. He also found that the liquidators repeatedly violated the "automatic stay" in U.S. Bankruptcy law. Nevertheless, he removed management with the appointment of a chapter 11 trustee and gave the liquidators shared control over the Soundview debtors. The Soundview directors have filed an appeal.

The Soundview trustee selected by the U.S. Trustee and approved by the Bankruptcy Court appears to have the same undisclosed connections as the previously fiduciaries have had in these associated cases. She appears to be pursuing a plan with the Fletcher Trustee.

The Fletcher Trustee's "Plan of Liquidation," awards the majority of the estate to the Ernst &
Young Liquidators, representatives of the Louisiana officials, former indirect investors whose
redemption was disregarded by the Cayman court proceedings in which they were represented by the
judge's personal counsel.  The Trustee has settled for less than $20 million claims estimated well in
excess of $200 million relating to a) Ion Geophysical Corporation whose chairman is a Louisiana
official and b) United Community Banks Inc. which is associated with Angelo Gordon partner
JPMorgan.  In these settlements, the companies were represented by counsel representing John Angelo
or Angelo Gordon.  The Plan proposes to create a litigation trust to file frivolous suits against insiders
including plaintiff's suing parties associated with Angelo Gordon and service providers who are primary
witnesses.  Neither the Plan nor the Trustee's Report makes any allegations against the adversaries of
Fletcher International, Ltd. whose bad acts caused such great harm including the Angelo/Dakota Parties.
The Soundview Fiduciaries' estates, as indirect stakeholders in the Fletcher International, are the victims
of these undisclosed conflicts and self-interested dealings, however the Soundview Fiduciaries have ties
to and represent the same parties.

## Soundview Fiduciaries and Their Connections

Corinne Ball of Jones Day was selected by the U.S. Trustee program and approved by the
Bankruptcy Court.  Ms. Ball and Jones Day have connections to the funds' adversary John Angelo and
his firm Angelo Gordon as do fiduciaries previously appointed in these associated cases and related
offshore cases.  Ms. Ball appointed her law firm, Jones Day, as trustee's counsel.  The retention
applications of Ms. Ball and Jones Day did not list John Angelo and Angelo, Gordon & Co. as a
connection. Others not listed include targets for significant claims in these cases such Ernst & Young,
Zolfo Cooper, D.E. Shaw, and News Corporation.35 [March 19 Letter Motion to Compel, Page 4]

Zolfo Cooper was included in supplemental disclosure filings. As discussed at length during the hearing for the motion to appoint a trustee, HSBC is a primary target. HSBC is Jones Day client.

Ms. Ball appointed Geoffrey Varga of Kinetic Partners as her financial advisor. Mr. Varga did not disclose his work with Quinn Emanuel. This work includes a multi-billion dollar Cayman windup and related chapter 15 proceeding 6 in 2010. Quinn Emanuel was retained in 2010 by Dakota Inc. for its dealings with Fletcher. Mr. Varga also did not disclose that Young Conaway presented Mr. Varga to the Court as a potential "independent fiduciary" for Fletcher International, Ltd. despite Fletcher's concerns about Mr. Varga's connection to Quinn.[11] Mr. Varga's disclosure did not mention that Mr. Varga replaced the investment manager of another fund group in an insolvency proceeding with the approval of Young Conaway and the Louisiana Officials in the Fletcher International, Ltd. proceedings.[12] [March 19 Letter Motion to Compel, Page 4]

From January 23 forward, Appellants, believing that they continued to control the debtors until the appointment of a chapter 11 trustee, "diligently but unsuccessfully worked with debtors' counsel to file an appeal." [Appendix p. 67 - footnote] On February 3, 2014, the Bankruptcy Court's final order "Approving the Appointment of Chapter 11 Trustee" was signed. The Appellants sent an email from Alphonse Fletcher (the "AF email") [Appendix p. 53] and the Notice of Appeal for the Bench Decision (the "Notice") [Appendix p. 13] to all of the Appellees and the Bankruptcy Court at 11:00 p.m. PST, February 6, 2014, or fourteen days after the Bench Decision was entered. The body of the email included a request (the "Request") which stated:

> Attached is a notice of appeal from Alphonse Fletcher, Jr., pro se, and George E. Ladner, pro se, the directors of Soundview Elite, Ltd., et al. We will quickly correct any procedural missteps or make any revisions as we become aware of them. We prepared this without the assistance of Debtors' counsel.

The Appellants did not receive a response. During the February 25, 2014 Hearing with Judge Gerber presiding, proposed counsel to the Trustee ("Trustee Counsel") initiated a discussion of the Appeal and stated that it had

> "been in communication with Mr. Morrissey, the United States Trustee's Program on this point and pursuant to those conversations, we believe that Mr. Morrissey who is here in the Courtroom today, would like the opportunity to address this matter at today's hearing."

Neither Trustee Counsel nor Richard Morrissey of the United States Trustee ("US Trustee") program[13] raised the timeliness challenge to the Appeal or the Appellants' filing of their designation four days earlier on February 21, 2014.

> "THE Court [Judge Gerber]: So, as I understand the 8000 series of the Federal Rules of Bankruptcy Procedure, after one side designates the record, the other adds any designations that are appropriate and then it's docketed in the district Court and the district Court does its thing. But I would have thought that any further action, unless a stay is entered, continues in this Court without interruption and the district Court can do its thing under the schedules that district Courts do. Am I missing something?" [Appendix p.57: 21-25 p. 58:1-4].

> "MR. MORRISSEY [of the US Trustee program]: Your Honor, I think you're missing nothing." [Appendix p.58: 5-6].

Days later, the US Trustee program filed a motion to dismiss for lack of jurisdiction claiming that the pro se notice of appeal arrived one day late and did not include a "request" for the additional day. The appellants argued that the retaliatory litigation that had plagued their affiliates should meet the standard for "excusable neglect." The District Court disagreed and the Appllants sought an appeal to the Circuit Court.

On March 12, Fletcher wrote to Judge Gerber to express concern regarding the undisclosed connections between Fiduciaries and parties holding interests adverse to the estates in these associated cases. On March 19 by letter then again on March 21 as a formal motion as required by the Court, , Fletcher filed his formal motion to compel the fiduciaries to disclose their connections under 2014 as required by the Court.[14]

## SUMMARY OF THE ARGUMENT

Each of the court-appointed fiduciaries serving *Soundview Elite et al* represented to the Court that it had "disclose[d] all facts" and connections that "would even faintly color the independence and impartial attitude required by the Code and Bankruptcy Rules." The disclosed and undisclosed connections described to the Bankruptcy Court and described below, however, including connections to parties related to the defendants in Fletcher v Dakota,[15] a race discrimination-retaliation case Alphonse Fletcher filed in 2011, reveal "divided loyalties and affected judgments."[16] Fiduciaries with connections

to such parties could have interests "consistent with Defendant Barnes' threat to Fletcher in June 2010 that if Fletcher went ahead and vindicated his rights by filing this lawsuit, the [Dakota] Board would do everything in its power to destroy Fletcher and his reputation in the business community."[17]

Despite their prominence, the Soundview Fiduciaries and the Fletcher International Fiduciaries have persisted in trivializing their failure to comply with their obligations to disclose all connections.

> They have been threatening and has disregarded the principle that fiduciaries cannot have a "'material adverse' interest to any party to the bankruptcy 'for any ... reason,' either at the time of appointment or during the course of the bankruptcy." In re Big River quoting In re Marvel Entm't Group, 140 F.3d 463, 476 (3d Cir. 1998) ("A plain reading of this section suggests one is a `disinterested person' only if he has no interest that is materially adverse to a party in interest in the bankruptcy.").

> They have sought to arrogate to himself, decisions that are not his. "The Court stated that 'there is 'no merit to the . . . argument that [a party] did not have to disclose its connections . . . because its attorneys did not feel that a conflict existed.' . . . Weil Gotshal had no right to 'make a unilateral determination regarding the relevance of a connection.'"[18] In re GSC quoting In re Leslie Fay. This can be seen in his dismissive, condescending, and bullying comments.

> They are aware certainly that "the decision as to what information to disclose should not be left to counsel, whose judgment may be clouded by the benefits of the potential employment." In re Persaud, 496 B.R. 667, 675 (E.D.N.Y. 2013) If the Fiduciaries continue to arrogate the decision to disclose all connections, especially connections to the estate's adversaries, "the question will always linger whether it held back, or failed to bite the hand that feeds it quite as hard as the circumstances warranted." Granite Partners, 219 B.R. at 38."

> Section 101(14)(A) o fthe Bankruptcy Code provides that a person is "disinterested" if that person "is not a creditor, an equity holder, or an insider."l 11 U.S.C. § 101(14)(A). Section101(14)(C) of the Bankruptcy Code provides that a "disinterested person" is someone who "does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason." 11 U.S.C. § 101(14)(C).

> To be disinterested is "to prevent even the appearance of a conflict irrespective of the integrity of the person or firm under consideration." In re Vebeliunas, 231 B.R. 181, 191 (Bankr. S.D.N.Y. 1999), dismissed on appeal, 246 B.R. 172 (S.D.N.Y. 2000) (citing In re Codesco, Inc., 18 B.R. 997, 999 (Bankr. S.D.N.Y. 1982» (additional citations omitted); see also In re Angelika Films 57th, Inc., 227 B.R. 29, 38 (Bankr. S.D.N.Y. 1998) ("The determination of adverse interest is objective and is concerned with the appearance of impropriety."). A disinterested on "should be divested of any scintilla of personal interest which might be reflected in his decision concerning estate matters." Vebeliunas, 231 B.R. 191-92 (citations and quotations omitted). The most modest interest or relationship will undo a person's disinterestedness if it "would even faintly color the independence

and impartial attitude required by the Code and Bankruptcy Rules." In re Granite Partners, L.P., 219 B.R. 22,23 (Bankr. S.D.N.Y. 1998» (internal quotations and citations omitted).

The failures to disclose connections and adverse interests by the court-appointed Fiduciaries, officers of the court, has seriously damaged the integrity and impartiality of these and related legal proceedings. Fiduciaries have betrayed their client, the Court, and the public by failing to disclose and have even denied connections they held to parties with interests adverse to the estate.

## ARGUMENT

## GOVERNING LAW.

### The Honorable Shelley C. Chapman's recent opinion succinctly highlights the issues.

Judge Chapman's opinion In re GSC Group reviews the conduct in Leslie Fay of Weil Gotshal and the conduct of Harrison Goldin as trustee to Granite Partners. The opinion underscores the

> In the last twenty years, there have been two seminal cases in this District involving serious allegations of misconduct in connection with the retention and compensation of professionals in a large chapter 11 case, Leslie Fay and Granite Partners[19]...
>
> Judge Brozman found that Weil (i) represented interests that were materially adverse to the debtors at the time of its retention and (ii) violated Rule 2014 by not making complete disclosure of its connections, thereby causing actual injury to Leslie Fay. Regarding its relationship with members of the audit committee, Weil did not deny its lack of disinterestedness, but instead asserted that, by the time it was retained as counsel for the debtors, it was clear that no claims existed against such audit committee members. While the Court did not doubt Weil's belief that no claims existed, it found that, pursuant to Rule 2014, Weil was required to have disclosed its connections to the members. The Court stated that "there is 'no merit to the . . . argument that [a party] did not have to disclose its connections . . . because its attorneys did not feel that a conflict existed.' . . . Weil Gotshal had no right to 'make a unilateral determination regarding the relevance of a connection.'"[20] Similarly, with respect to BDO, the court also found that Weil was not disinterested. In commenting on Weil's undisclosed ties to three different targets of the audit committee investigation, Judge Brozman observed that "[i]t was for the Court, and not Weil Gotshal, to determine whether in fact a conflict existed and, if so, what the remedy should be." Id... As the court stated,

"[t]he shame in all of this is that the heavy financial and emotional toll in this matter could have been avoided completely..."[21]

Four years after Leslie Fay, Judge Bernstein put his imprimatur on the issue of disclosure in his Granite Partners decision.[22] In Granite Partners, the debtors had invested in funds raised by outside investors which held collateralized mortgage obligations created and sold by broker- dealers, including Merrill, Lynch, Pierce, Fenner & Smith, Inc. ("Merrill"). Granite Partners' chapter 11 filings in April 1994 followed the collapse of their business due to margin calls by broker-dealers that could not be met after the value of the debtors' investments dropped and interest rates rose. Upon the motion of the creditors' committee, the court appointed a chapter 11 trustee (the "Trustee") to investigate and report on the events leading to the debtors' collapse and identify possible claims against (i) the broker-dealers, (ii) the debtors' insiders, and (iii) the debtors' professionals, including the debtors' auditor, Price Waterhouse & Co. ("PWC")...

In his opinion, Judge Bernstein undertook a lengthy review and analysis of (i) section 327(a) of the Bankruptcy Code, which requires that retained professionals be "disinterested" and (ii) Bankruptcy 2014(a), which imposes disclosure requirements on trustees and the professionals they seek to retain. Id. at 32-36. Judge Bernstein concluded that "[p]roper disclosure allows the court to decide, in an informed manner, whether the retention should be approved." Id. at 35.

Judge Bernstein found that Willkie represented adverse interests at the time it undertook representation of the Trustee due to its concurrent relationship with Merrill. Id. at 36. Due to its increased representation of Merrill (and the amount of fees generated by its work for Merrill), no matter how thoroughly or fairly Willkie conducted the investigation on behalf of the Trustee, "the question will always linger whether it held back, or failed to bite the hand that feeds it quite as hard as the circumstances warranted." Id. at 38. Judge Bernstein observed that the Trustee's counsel must be above suspicion, as "[b]ankruptcy is concerned as much with appearances as with reality." Id... The court [observed] that:

> The trustee broke the cardinal principle of Rule 2014(a). He arrogated to himself a disclosure decision that the Court must make. Rule 2014(a) required, even in the absence of an investigation, that the trustee disclose Willkie Farr's connections with the debtors' accountants. Here, the need for disclosure went further. The trustee knew that Price Waterhouse was a target of his own investigation. He should have understood the improper perception created by Willkie Farr investigating any accountant in light of its association with the AICPA and its policy of not suing accountants. He nevertheless decided, on his own, that the connection was not a conflict, and the refusal to sue was not an obstacle, and he concluded that he did not have to disclose it. He made a decision that was never his to make in the first place, and reached the wrong conclusion when he did.

Id. at 45.[23]
Taken together, Leslie Fay and Granite Partners stand for the straightforward

proposition that it is incumbent upon the professional to make full disclosure, after which it is the role of the court, and not the professional, to make the ultimate determination vis-à-vis the information disclosed and compliance with the Bankruptcy Code and Rules.

In re GSC Group, Inc. [10-bk-14653]

## **"Complete and truthful disclosure of all connections and fee arrangements must be made."**

The Bankruptcy Code extends an administrative fee priority, payable in full in advance of other claimants, to professionals retained by the estate. <u>See</u> 11 U.S.C. §§ 507(a)(2) and 503(b)(2). Although this significant advantage may be "the oil that greases the gears of the bankruptcy system," because of the great potential for abuse, "the court has a great oversight responsibility to ensure that professional fees are reasonable and are paid in exchange for services that benefit the estate." <u>In re Egwu,</u> No. 10-30652 (RAG), 2012 WL 5193958, at *3 (Bankr. D. Md. Oct. 19, 2012) (citing <u>In re Park-Helena Corp.,</u> 63 F.3d 877, 880 (9th Cir. 1995) (additional citations omitted)).

The Bankruptcy Code's "myriad of provisions must be observed, and complete and truthful disclosure of all connections and fee arrangements must be made, both as a foundation for the allowance of administrative fees and to permit the court to discharge its oversight function." <u>Egwu,</u> 2012 WL 5193958, at *3; see also <u>In re Leslie Fay Cos.,</u> 175 B.R. 525, 537 (Bankr. S.D.N.Y. 2002) (all connections that are not so remote as to be <u>*de minimis*</u> must be disclosed).

## **Section 327(a) of the Bankruptcy Code.**

The Bankruptcy Code permits the debtor in possession to retain one or more professionals. 11 U.S.C. § 327. Section 327(a) of the Bankruptcy Code provides in pertinent part:

> (a) Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.[24]

11 U.S.C. § 327(a).

## Disinterestedness.

To be retained by the estate, professionals must be both disinterested and not hold or represent any adverse interest to the estate. In re Project Orange Assocs., LLC, 431 B.R. 363, 369 (Bankr. S.D.N.Y. 2010) (citing Vouzianas v. Ready & Pontisakos (In re Vouzianas), 259 F.3d 103, 107 (2d Cir. 2001) (citing Bank Brussels Lambert v. Coan (In re AroChem Corp.), 176 F.3d 610, 621 (2d Cir. 1999)). Courts lack the power to authorize the "employment of a professional who has a conflict of interest." In re Mercury, 280 B.R 35, 55 (Bankr. S.D.N.Y. 2002).

Section 101(14)(A) of the Bankruptcy Code provides that a person is "disinterested" if that person "is not a creditor, an equity holder, or an insider."[25] 11 U.S.C. § 101(14)(A). Section 101(14)(C) of the Bankruptcy Code provides that a "disinterested person" is someone who "does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason." 11 U.S.C. § 101(14)(C).

To be disinterested is "to prevent even the appearance of a conflict irrespective of the integrity of the person or firm under consideration." In re Vebeliunas, 231 B.R. 181, 191 (Bankr. S.D.N.Y. 1999), dismissed on appeal, 246 B.R. 172 (S.D.N.Y. 2000) (citing In re Codesco, Inc., 18 B.R. 997, 999 (Bankr. S.D.N.Y. 1982)) (additional citations omitted); see also In re Angelika Films 57th, Inc., 227 B.R. 29, 38 (Bankr. S.D.N.Y. 1998) ("The determination of adverse interest is objective and is concerned with the appearance of impropriety."). A disinterested person "should be divested of any scintilla of personal interest which might be reflected in his decision concerning estate matters." Vebeliunas, 231 B.R. 191-92 (citations and quotations omitted). The most modest interest or relationship will undo a person's disinterestedness if it "would even faintly color the independence and

impartial attitude required by the Code and Bankruptcy Rules." In re Granite Partners, L.P., 219 B.R. 22, 23 (Bankr. S.D.N.Y. 1998)) (internal quotations and citations omitted).

Courts in this district have found that the definition of "disinterested person" "overlaps with the adverse interest requirement of section 327(a), creating a single test for courts to employ when examining conflicts of interest." See, e.g., In re MF Global, Inc., 464 B.R. 594, 600 (Bankr. S.D.N.Y. 2011) (quoting Project Orange, 431 B.R. at 370 (citing 11 U.S.C. § 101(14) (C))); see also Granite Partners, 219 B.R. at 23 (observing that "the two prongs of Section 327(a) are duplicative and form a single test to judge conflicts of interest") (internal citations omitted). Thus, under both Sections 327 and 101(14) of the Bankruptcy Code, a professional must not "hold or represent an interest adverse to the estate." See AroChem, 176 F.3d at 622-23.

Although not defined by the Bankruptcy Code, the Second Circuit has held that "to hold or represent an adverse interest" means:

> to possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or (2) to possess a predisposition under circumstances that render such a bias against the estate.

AroChem, 176 F.3d at 623 (quoting In re Roberts, 46 B.R. 815, 827 (Bankr. D. Utah 1985), aff'd in part and rev'd on other grounds, 75 B.R. 402 (D. Utah 1987)). However,

> [r]ather than worry about the potential/actual dichotomy, it is more productive to ask whether a professional has either a meaningful incentive to act contrary to the best interest of the estate ... - an incentive sufficient to place those parties at more than acceptable risk – or the reasonable perception of one ... In other words, **if it is plausible** that the representation of another interest may cause the trustee's attorneys to act differently than they would without the representation, then they have a conflict and an interest adverse to the estate. *(Emphasis added.)*

Id. (citations and internal quotation marks omitted); see also MF Global, 464 B.R. at 600 ("a more recent trend elides the distinction [between actual and potential conflicts] and focuses on the concerns of divided loyalties and affected judgments.") (quoting Granite Partners, 219 B.R. at 33)); Leslie Fay, 175 B.R. at 532 ("The requirements of Section 327 of the Bankruptcy Code cannot be taken lightly,

for they 'serve the important policy of ensuring that all professionals appointed pursuant to [the section] tender undivided loyalty and provide untainted advice and assistance in furtherance of their fiduciary responsibilities.'") (quoting <u>Rome v. Braunstein,</u> 19 F.3d 54, 58 (1st Cir. 1994)).

Courts determine whether an adverse interest exists on a case-by-case basis, examining the specific facts in a case. <u>AroChem,</u> 176 F.3d3 at 623; <u>see also Angelika Films,</u> 227 B.R. at 39 (same).

## The Mandatory Duty of Professionals to Disclose Connections

The purpose of the retention application is to provide the court (and the United States Trustee) with information necessary to determine whether the professional's employment is: (i) in the best interest of the estate and (ii) necessary. <u>See Leslie Fay,</u> 175 B.R. at 533; <u>see also</u> Fed. R. Bankr. P. 2014(a). Failure to disclose any fact that may influence the court's decision on retention may result in a later determination that disclosure was inadequate and sanctions should be imposed upon the professional. <u>See In re B.E.S. Concrete Prods., Inc.,</u> 93 B.R. 228 (Bankr. E.D. Cal. 1988); <u>accord</u> <u>Leslie Fay,</u> 175 B.R. at 525.

### Bankruptcy Rule 2014(a).

Bankruptcy Rule 2014 was enacted to implement the appointment of professionals, including under Section 327 of the Bankruptcy Code. 9 Alan N. Resnick & Henry J. Sommer (eds.), <u>Collier on Bankruptcy</u> [hereinafter, "<u>Collier</u>"] ¶ 2014.03 (16th ed. 2012). The rule is very broad and provides a mechanism for ensuring the disinterestedness of retained professionals. <u>In re Fibermark, Inc.,</u> No. 04-10463, 2004 WL 723495, at *8 (Bankr. D. Vt. Mar. 11, 2006).

In pertinent part, Bankruptcy Rule 2014 provides:

a.     *Application for an Order of Employment.* An order approving the employment of attorneys . . . or other professionals pursuant to § 327 . . . of the Code shall be made only on application of the trustee or committee. . . . The application shall state the specific facts showing the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the

United States trustee, or any person employed in the office of the United States trustee. The application shall be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.[26]

Fed. R. Bankr. P. 2014(a).

Bankruptcy Rule 2014(b) further elucidates the requirements of Section 327(a) of the Bankruptcy, see supra at 63, by making clear that only a person or entity that is a partner, member or associate of a partnership or corporation hired as attorneys or accountants can perform services or be employed for the debtors without the necessity for a separate application. Fed. R. Bankr. P. 2014(b).

## **Bankruptcy Rule 2016.**

The duty to disclose connections also is embodied in Bankruptcy Rule 2016, which provides in pertinent part:

> . . . a statement as to what payments have theretofore been made or promised to the applicant for services rendered or to be rendered in any capacity whatsoever in connection with the case, the source of the compensation so paid or promised, whether any compensation previously received has been shared and whether an agreement or understanding exists between the applicant and any other entity for the sharing of compensation received or to be received for services rendered in or in connection with the case, and the particulars of any sharing of compensation or agreement or understanding therefor . . . .

Fed. R. Bankr. P. 2016(a).[27] See also UST Fee Guidelines b(1)(ii) and (iii) (requiring disclosure of fee arrangements).

> "The Bankruptcy Code and Rules mandate that a professional, such as an Examiner, be a neutral, disinterested party in the case. The moment that the Examiner approached three of Big Rivers' largest unsecured creditors and broached the subject of his compensation, suggesting that they pay him a percentage-based fee based on the "success" or "new value" he brought them to the estate, he was no longer a disinterested party. Whether or not such an agreement was reached or whether an agreement was subject to the approval of the bankruptcy court is irrelevant. What is relevant is that the Examiner sought to have his compensation tied to the enhanced value brought to the estate and, in particular, tied to what [Bank of New York], Chase and Mapco received on their claims from the estate."

*In re Big Rivers Elec. Corp..*, 355 F.3d 415, 428 (6th Cir. 2004)

## **The Professional's Duty to Disclose is Self-Policing.**

The professional's duty to disclose is self-policing. <u>Granite Partners,</u> 219 B.R. at 35 (citing <u>Kravit, Gass & Weber, S.C. v. Michel (In re Crivello),</u> 134 F.3d 831, 839 (7th Cir. 1998)). The court relies primarily on forthright disclosure to determine qualification under Section 327 of the Bankruptcy Code. <u>Id.</u> (citing <u>Rome,</u> 19 F.3d at 59); <u>see also MF Global,</u> 464 B.R. at 602 (a lack of candor in "disclosing [] potential problem[s] for independent court review before a [professional's] appointment . . . in itself, presents an appearance of impropriety.") (quotation omitted).

Courts in this circuit consistently hold that it is the duty of the professional, and not the court, to make sure that "all connections" have been disclosed. In <u>Fibermark,</u> the court opined:

> It is not the duty of the court, the U.S. Trustee or any other party to search beyond the 2014(a) disclosure for the existence of connections that a professional seeking to be employed should have disclosed. Full disclosure of all connections to a party in interest is the affirmative duty placed on the professional seeking employment. The duty to disclose all possible connections is so vital to the bankruptcy process that failure to do so is an independent basis for the disallowance of fees.

<u>In re Fibermark, Inc.,</u> No. 04-10463, 2006 WL 723495, at *9 (Bankr. D. Vt. Mar. 11, 2006) (citing <u>Futuronics Corp. v. Arutt, Nachamie and Benjamin (In re Futuronics Corp.),</u> 655 F.2d 463, 469 (2d Cir. 1981); <u>In the Matter of Arlan's Dep't Stores, Inc.,</u> 615 F.2d 925, 933 (2d Cir. 1979)) (additional citations omitted); <u>see also Leslie Fay,</u> 175 B.R. at 533 (same); <u>In re Source Enters., Inc.,</u> No. 06-11707 (AJG), 2008 WL 850229, at *8 (Bankr. S.D.N.Y. Mar. 27, 2008) (same); <u>In re Matco Elecs. Group, Inc.,</u> 383 B.R. 848, 853-54 (Bankr. N.D.N.Y. 2008) ("Fed. R. Bankr. P. 2014 is not intended to condone a game of cat and mouse, where the professional seeking appointment provides only enough disclosure to whet the appetite of the UST, the court or other parties in interest, and then the burden shifts to those entities to make inquiry in an effort to expand the disclosure."); <u>Granite Partners,</u> 219 B.R. at 35 (the court "should not have to rummage through files or conduct independent fact finding investigations" to determine if the professional is disqualified.) (quotations omitted).

"Absent the spontaneous, timely and complete disclosure required by Section 327(a) and Fed. R. Bankr. P. 2014(a), the court appointed counsel proceed *at their own risk.*" Fibermark, 2006 WL 723495, at *9 (emphasis in original) (quoting Rome, 19 F.3d at 59-60)); see also In re Roger J. Au & Son, Inc., 71 B.R. 238, 242 (Bankr. N.D. Ohio 1986) (failure to disclose fact material to potential conflict may provide *totally independent* ground for denial of fees quite apart from the actual representation of competing interests).

Further, the Fibermark court emphasized that "[i]n light of the court's responsibility to approve the employment of professionals, the disclosure requirements of Rule 2014(a) are broader than those governing inquiries into disinterestedness under § 327." Fibermark, 2006 WL 723495, at *5 (citing Leslie Fay, 175 B.R. at 536) (retention under Section 327 is only limited by interests that are "materially adverse," whereas under Bankruptcy Rule 2014, "all connections" that are not so remote as to be *de minimis* must be disclosed); see also Source Enters., 2008 WL 850229, at *8 (the "term 'connections' is broad and is strictly construed for purposes of Bankruptcy Ruled 2014) (citing Balco Equities Ltd. v. Cohen, Estis and Assocs., LLP (In re Balco Equities Ltd.), 345 B.R. 87, 112 (Bankr. S.D.N.Y. 2006) ("Failure to disclose direct or indirect relations to, connections with, or interest in the debtor violate ... [s]ection 327(a) and Bankruptcy Rule 2014")). Thus, "[p]rofessionals who seek appointment owe the duty of complete disclosure of all "connections" that bear upon their eligibility for such appointment." Fibermark 2006 WL 723495, at *9.

In addition, disclosure will not be adequate if it is not sufficiently specific. "Boilerplate" disclosure may cover an inadvertent failure to disclose an insignificant connection, but is not an adequate substitute for discloser of known and significant connections. See Leslie Fay, 175 B.R. at 537. To find otherwise, would eviscerate the disclosure requirements of Bankruptcy Rule 2014(a). *Id.*

### Courts Strictly Construe the Duty to Disclose.

"Courts have an obligation to construe Rule 2014 very strictly because it is the courts'

party in interest." <u>Fibermark</u>, 2006 WL 723495, at *8 (citing <u>Diamond Lumber Inc. v. Unsecured Creditors' Comm.</u>, 88 B.R. 773, 777 (N.D. Tex. 1988)); <u>see also MF Global</u>, 464 B.R. 600-01 (in construing disinterestedness, bankruptcy courts hold trustee and their retained professionals to a rigorous standard). "It is for the courts to decide what facts may be relevant and that decision should not be left to the professional, 'whose judgment may be clouded by the benefits of the potential employment.'" <u>Id.</u> (quoting <u>In re Lee</u>, 94 B.R. 172, 177 (Bankr. C.D. Cal. 1988)); <u>see also Source Enters.</u>, 2008 WL 850229, at *8 (persons to be employed "'must disclose all facts that bear on [their] disinterestedness and cannot usurp the court's function by choosing, <i>ipse dixit,</i> which connections impact disinterestedness and which do not. The existence of an arguable conflict must be disclosed if only to be explained away . . . .'") (emphasis in original) (citing <u>In re C&C Demo, Inc.</u>, 273 B.R. 502, 507 (Bankr. E.D. Tex. 2001) (quoting <u>Granite Partners</u>, 219 B.R. at 35)).

Furthermore, whether an applicant's retention application or supplemental disclosures satisfy the United States Trustee does not affect the professional's obligation to make full and candid disclosure of all connections to the court. <u>See Source Enters.</u>, 2008 WL 850229, at *13.

### The Duty To Disclose is Continuing.

Although Bankruptcy Rule 2014(a) does not expressly require supplemental or continuing disclosure, <u>see In re Caldor, Inc.</u>, 193 B.R. 165, 176 (Bankr. S.D.N.Y. 1996), Section 327(a) of the Bankruptcy Code implies a duty of continuing disclosure, and requires professionals to reveal connections that arise after their retention. <u>Granite Partners</u>, 219 B.R. at 35 (additional citations omitted). "Continuing disclosure is necessary to preserve the integrity of the bankruptcy system by ensuring that the trustee's professionals remain conflict free." <u>Id.</u>

In addition, an attorney is under a duty to promptly notify the court if any potential for conflict arises. <u>See Crivello</u>, 134 F.3d at 831; <u>see also Rome</u>, 19 F.3d at 59-60 ("[A]s soon as counsel acquires even a constructive knowledge reasonably suggesting an actual or potential

## Failure to Disclose Has Serious Consequences.

Failure to comply with the disclosure rules is a sanctionable violation, even if proper disclosure would have shown that the professional had not actually violated any Bankruptcy Code provision or any Bankruptcy Rule. See I.G. Petroleum, L.L.C. v. Fenasci (In re W. Delta Oil Co.), 432 F.3d 347, 355 (5th Cir. 2005) (holding that "[w]e have observed that these standards are 'strict' and that attorneys engaged in the conduct of a bankruptcy case 'should be free of the slightest personal interest . . . [a]ccordingly, we are 'sensitive to preventing conflicts of interest' and require a 'painstaking analysis of the facts and precise application of precedent'") (internal citations omitted); see also Matter of Olsen Indus., Inc., 222 B.R. 49, 60 (Bankr. D. Del. 1997) (because nondisclosure was intentional and serious, it was not necessary for the court to determine the firm's disinterestedness to order disgorgement of fees); In re eToys, Inc., 331 B.R. 176, 190 (Bankr. D. Del. 2005) ("So important is the duty of disclosure that the failure to disclose relevant connections is an independent basis for the disallowance of fees.") (quoting Leslie Fay, 175 B.R. at 533).

Nondisclosure of relevant information under Bankruptcy Rule 2014 is sanctionable even if the failure to disclose was negligent or inadvertent. See, e.g., In re BH & P, Inc., 949 F.2d 1300, 1318 (3d Cir. 1991) ("[n]egligence does not excuse the failure to disclose possible conflict of interests"); see also In re Jore, 298 B.R. 703, 729 (Bankr. D. Mo. 2003) (same) (citations omitted).

Where the failure to disclose is willful, disallowance of fees is almost assured. In fact, willful nondisclosure of relationships in connection with the retention of professionals may rise to the level of a fraud upon the court. See Pearson v. First NH Mort. Corp., 200 F.3d 30, 35-41 (1st Cir. 1999); see also Crivello, 134 F.3d at 836-37 (stating that "a bankruptcy court should punish a willful failure to disclose the connections required by Fed. R. Bankr. P. 2014 as severely as an attempt to put forth a fraud on the court."); accord In re ACandS, Inc., 297 B.R. 395, 405 (Bankr. D. Del. 2003) (disallowing nunc pro tunc retention and ordering disgorgement of all fees of professional which willfully concealed relationships and potential and actual conflicts).

**Court May Allow Reasonable Compensation To Retained Professionals From the Estate Upon Proper Application With Requisite Disclosure.**

### Section 330(a)(1) of the Bankruptcy Code.

Bankruptcy Code Section 330(a)(1) provides that:

After notice to the parties in interest and the United States trustee and a hearing, and subject to section 326, 328, and 329, the court may award to a trustee, ... an examiner, ... or a professional person employed under section 327 or 1103 –

> (A) reasonable compensation for actual, necessary services rendered by the trustee, examiner, professional person, ... or attorney and by any paraprofessional person employed by any such person; and

> (B) reimbursement for actual, necessary expenses.

11 U.S.C. § 330(a)(1)(A) and (B). Only a professional whose retention is approved by order of the court may be compensated from the estate. Lamie v. United States Trustee, 540 U.S. 526, 526 (2004).

To determine reasonableness, Section 330(a)(3) sets forth various factors that the court must consider, including among others, "whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title." 11. U.S.C. § 330(a)(3)(f). The fee applicant bears the burden of proof on its claim for compensation. In re GSC Group, Inc., No. 10-14653 (AJG), 2012 WL 676409, at *2 (Bankr. S.D.N.Y. Feb. 29, 2012) (citations omitted). In addition, "[T]he court may, on its own motion or on the motion of the United States Trustee for the Region or the District, or any other party in interest, award compensation that is less than the amount of compensation that is requested." GSC Group, 2012 WL 676409, at *1. (additional citation omitted); see also 11 U.S.C. § 330(a)(2) (court may award less than amount of fees requested).

### Section 329 of the Bankruptcy Code.

Section 329 of the Bankruptcy Code gives the Court the power to review the

compensation paid to a debtor's attorney if such payment or an agreement to be paid was made after

one year before the date of the filing of the petition, and to determine if the fee paid was, or is,

reasonable or excessive. Section 329(b) provides:

> (b) If such compensation [of bankruptcy counsel] exceeds the reasonable value of any such services, the court may cancel any such agreement, or order the return of any such payment, to the extent excessive, to—
>> (1) the estate if the property transferred—
>>> (A) would have been property of the estate; or
>>> (B) was to be paid by or on behalf of the debtor under a plan under chapter 11, 12, or 13 of this title; or
>> (2) the entity that made such payment.

11 U.S.C. § 329. Bankruptcy Rule 2017 provides the mechanism for a determination of whether

payments to an attorney are excessive. Fed. R. Bankr. P. 2017.

### Section 330(a)(5) of the Bankruptcy Code.

Section 330(a)(5) of the Bankruptcy Code specifically permits a court to order disgorgement

of interim payments received under Section 331 to the extent that they exceed the ultimate award, if

any, under Section 330. 11 U.S.C. § 330(a)(5). Thus, interim fee awards are always "subject to re-

examination and adjustment" and no professional may claim to be unaware of the inherent risk of

disgorgement. In re Rockaway Bedding, Inc., 454 B.R. 592, 596 (Bankr. D.N.J. 2011) (citing In re

St. Joseph Cleaners, Inc., 346 B.R. 430 (Bankr. W.D. Mich. 2006) (quoting Specker Motor Sales Co.

v. Eisen, 393 F.3d 659, 663 (6th Cir. 2004)).

### The Court May Vacate Its Own Retention Orders and Order Full Disgorgement Where There Has Been A Fraud Perpetrated Upon The Court.

#### Civil Rule 60(b) – Generally.

Bankruptcy Rule 9024 provides that Civil Rule 60 is applicable in bankruptcy cases.[28] Fed.

R. Bankr. P. 9024. Civil Rule 60(b) affords a party relief from a judgment if there existed:

(1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence . . . ; (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged ... or (6) any other reason that justifies relief. . . .[29]

Fed. R. Civ. P. 60(b).

"Properly applied, Rule 60(b) strikes a balance between serving the ends of justice and preserving the finality of judgments. It should be broadly construed to do 'substantial justice,' yet final judgments should not 'be lightly reopened. The Rule may not be used as a substitute for a timely appeal. Since 60(b) allows extraordinary judicial relief, it is invoked only upon a showing of "exceptional circumstances," in the discretion of the trial court. Nemaizer v. Baker, 793 F.2d 58, 61 (2d Cir. 1986) (internal citations omitted);see also In re Enron Corp., 352 B.R. 363, 369 (Bankr. S.D.N.Y. 2006) (these grounds "should be liberally construed when substantial justice will . . . be served") (quoting Radack v. Norwegian Am. Line Agency, Inc., 318 F.2d 538, 542 (2d Cir. 1963)).

Additional requirements are that (i) the supporting evidence be "highly convincing;" (ii) there be good cause for the movant's failure to act sooner; and (iii) application of the rule should not impose undue hardship on other parties. In re Old Cargo, LLC, 423 B.R. 40, 45 (Bankr. S.D.N.Y. 2010) (citing Freedom, N.Y., Inc. v. United States, 438 F.Supp.2d 457, 462-63 (S.D.N.Y. 2006) (citations omitted)). A decision concerning a Civil Rule 60(b) motion is within the discretion of the court. Old Cargo, 423 B.R. at 40 (citing Nemaizer, 793 F.2d at 61-62).

### Civil Rule 60(b)(6).

Civil Rule 60(b)(6), which permits a court to grant relief from a final order for "any other reason that justifies relief," "confers broad discretion on the trial court to grant relief when appropriate to accomplish justice [and] it constitutes a grand reservoir of equitable power to do justice in a particular case. It is properly invoked where there are extraordinary circumstances, or where the judgment may work an extreme and undue hardship[.]" Marrero Pichardo v. Ashcroft, 374 F.3d 46, 55 (2d Cir. 2004) (internal quotations and citations omitted); see also Andrulonis v. United States, 26 F.3d 1224, 1235

(2d Cir.1994) (Rule 60(b)(6) properly "invoked to override the finality of judgments in the interests of justice."); Matarese v. LeFevre, 801 F.2d 98, 106 (2d Cir. 1986) (Rule 60(b)(6) "confers broad discretion on the trial court to grant relief when appropriate to accomplish justice."); In re Teligent, Inc., 326 B.R. 219, 227 (S.D.N.Y. 2005); In re AMC Realty Corp., 270 B.R. 132, 143-44 (Bankr. S.D.N.Y. 2001). Thus, subject to the caveat that relief under this subsection may not be based upon a reason included in subclauses (1)-(5), see Nemaizer, 793 F.2d at 63, Civil Rule 60(b)(6) serves as an effective catch-all. See In re Lewis Road, LLC., No. 09-37672, 2011 WL 6140747 (Bankr. E.D. Va. Dec. 9, 2011) (court invoked Civil Rule 60(b)(3) and (b)(6) to vacate an order due to inadequate disclosure required by Section 327 of the Bankruptcy Code and Bankruptcy Rule 2014).

### Civil Rule 60(d)(3).

Rule 60(d)(3) also authorizes a court to "set aside a judgment" where there has been a "fraud on the court." Fed. R. Civ. P. 60(d)(3); Philips Lighting Co. v. Schneider, 395 F. App'x 796, 798 (2d Cir. Oct. 12, 2010); Old Cargo, 423 B.R. at 49. The rule applies where there is a "scheme to defraud" the court. See Hazel Atlas Glass Co. v. Harford-Empire Co., 322 U.S. 238, 245-46 (1944), overruled on other grounds by Standard Oil Co. of Cal. v. United States, 429 U.S. 17 (1976) (scheme to defraud both Patent Office and court constitutes fraud on the court); see also Pearson, 200 F.3d at 38 (fraud upon the court occurs where a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter.")

A court may invoke Civil Rule 60(d)(3), even on its own initiative, "to maintain the integrity of the courts and safeguard the public." United States v. Smiley, 553 F.3d 1137, 1142 (8th Cir. 2009); see also Martina Theatre Corp. v. Schine Chain Theatres, Inc., 278 F.2d 798, 801 (2d Cir. 1960). There must be clear and convincing evidence to support a Rule 60(d)(3) motion, King v. First Am. Investigations, Inc., 287 F.3d 91, 95 (2d Cir. 2002); Old Cargo, 423 B.R. at 51. Nevertheless, such a premium is placed on the court's mission to preserve its integrity that, although Federal Rule of Civil Procedure 60(c)(1) sets forth a one-year time limitation on a motion under Rule 60(b)(3), a Rule 60(d)(3) motion is not time-barred. Id.

"'[F]raud upon the court' as distinguished from fraud on an adverse party is limited to fraud which seriously affects the integrity of the normal process of adjudication." King, 287 F.3d at 95. (internal quotation omitted). Thus, Civil Rule 60(d)(3) embraces "only that species of fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases." *Id.* (internal quotation omitted). The Hazel-Atlas case has been described as a case in which a judgment was set aside on motion primarily on the basis "that an attorney was implicated in perpetrating the fraud." Kupferman v Consolidated Research and Mfg. Corp., 459 F.2d 1072, 1078 (2d Cir. 1972) (citing 7 James WM. Moore et al., Federal Practice ¶ 60.33 at 513 (3d ed. 2009)). As an officer of the court a lawyer must deal with the court with honesty and integrity. *Id.* If a lawyer betrays this duty of loyalty to the court, the lawyer is deemed to have "perpetrate[d] a fraud upon the court." *Id.*

Although the fraud or misconduct need not be the "primary basis for the ruling," the conduct must have "impressed, affected or influenced the court." Old Cargo, 423 B.R. at 52. However, fraud on the court may be present if a party inserts a false or forged document into the record. *Id.* (citing Weldon v. U.S., 225 F.3d 647, No. 99-6142, 2000 WL 1134358, at *2 (2d Cir. Aug. 9, 2000)). (additional citations omitted). Courts may also invoke the rule when an officer of the court has "fabricat[ed] . . . evidence." Smiley, 553 F.3d at 1145. This species of fraud has been defined as conduct "on the part of an officer of the court" that "is directed to the judicial machinery itself", "is willfully blind to the truth", "is a positive averment or a concealment when one is under a duty to disclose," and "that deceives the court." Workman v. Bell, 227 F.3d 331, 336 (6th Cir. 2000); see also Philips Lighting, 395 F. App'x at 798 (Rule 60(d) applies to conduct by officers of the court). Thus, participation by counsel is a key to a finding of fraud on the court. See Demjanjuk v. Petrovsky, 10 F.3d 338, 348 (6th Cir. 1993) (where government attorneys withheld exculpatory evidence); see also Kupferman, 459 F.2d at 1078 (attorney's "loyalty to the court, as an officer thereof, demands integrity and honest dealing with the court").

Fraud under Rule 60(d) concerns the integrity of the judicial process, see Lee v. Marvel Enters., 765 F.Supp.2d 440, 450 (S.D.N.Y. 2011), and fraud on the court interferes with the court's ability to decide cases. *Id.; see also King,* 287 F.3d at 95 (fraud on the court is fraud by officers of the court that prevents the court from "adjudging cases"); Andrada Fin., LLC v. Humara Group, Inc. (In re Andrada Fin. LLC), No. AZ-10-1209-JuMkPa, 2011 WL 3300983, at *4 n.9 (9th Cir. BAP) (Rule 60(d) "addresses a species of fraud . . . perpetrated by officers of the court so that the judicial machinery" cannot function properly). The movant under Rule 60(d) must show fraud on the court by clear and convincing evidence. See King, 287 F.3d at 95.

Although nondisclosure is not *per se* "fraud upon the court," see In re Levander 180 F.3d 1114, 1119 (9th Cir. 1999), it is fraud on the court where the failure to disclose deprived parties of the opportunity to mount a challenge to the relief sought at the original hearing. *Id.* at 1120. Civil Rule 60(d), therefore, certainly applies where the nondisclosure of a conflict under Section 327(a) prevented parties and the United States Trustee from challenging the retention of a professional in court. See Crivello, 134 F.3d at 839.

### The Court's Inherent Power To Impose Sanctions.

Bankruptcy courts have inherent authority to sanction parties for improper conduct. In re Feinberg, 215, 226 (Bankr. S.D.N.Y. 2010) (citing Mapother & Mapother, P.S.C. v. Cooper (In re Downs), 103 F.3d 472, 477 (6th Cir. 1996)); see also In re FairPoint Commc'ns, Inc., 445 B.R. 271, 276 (Bankr. S.D.N.Y. 2011) (sanctions may be imposed through the inherent power of the court); In re Plumeri, No. 10-10050 (MG), 2010 WL 3087685, at *2 (Bankr. S.D.N.Y. Mar. 25, 2010) ("Bankruptcy Courts, like Article III courts, enjoy inherent power to sanction parties for improper conduct.") (quotation omitted). A court possesses wide discretion when imposing these sanctions. Reilly v. Natwest Markets Group, Inc., 181 F.3d 253, 267 (2d Cir. 1999).

The applicable standard in imposing sanctions on an attorney pursuant to a court's inherent power depends upon the nature of the conduct in question. FairPoint, 445 B.R. at 276. The Second Circuit, in U.S. v. Seltzer held that a finding of bad faith is necessary only when sanctions are imposed for a lawyer exceeding "conduct of the sort that is normally part of the attorney's legitimate efforts at zealous advocacy for the client." U.S. v. Seltzer, 227 F.3d 36, 40 (2d Cir. 2000). In cases where sanctions are imposed for conduct that impacts the orderly running of the court system and is not undertaken for the client's benefit, bad faith need not be shown. FairPoint, 445 B.R. at 276.

**The Fiduciaries failed to make complete and candid disclosure.**

**Undisclosed and Partially Disclosed Conflicts that Preceded the June 29, 2012 Filing of Bankruptcy for FILB**

> [C] with the statutory requirement of "disinterest," the [Fiduciaries] may not have a "material adverse" interest to any party to the bankruptcy "for any … reason," either at the time of appointment or during the course of the bankruptcy.  See In re Marvel Entm't Group, 140 F.3d 463, 476 (3d Cir. 1998) ("A plain reading of this section suggests one is a `disinterested person' only if he has no interest that is materially adverse to a party in interest in the bankruptcy."); *Roger J. Au Son, Inc. v. Aetna Ins. Co. (In re Roger J. Au Son, Inc.),* 64 B.R. 600, 605 n. 8 (N.D.Ohio 1986) (This section "appears broad enough to include anyone who in the slightest degree might have some interest or relationship that would color the independent and impartial attitude required by the Code.") (quotation and citation omitted); *In re Watson,* 94 B.R. 111,116 (Bankr.S.D.Ohio 1988) ("A disinterested person should be divested of any scintilla of personal interest which might be reflected in [that person's] decisions concerning estate matters.").
> In re Big River

**The Fiduciaries' Lack of Disinterest**

The Fiduciaries connections to Fletcher v Dakota are not *de minimis*.

Courts in this district have held that the disinterestedness requirement mandates that a person "should be divested of any scintilla of personal interest which might be reflected in his decision concerning estate matters." Vebeliunas, 231 B.R. 191-92 (citations and quotations omitted); see also Granite Partners, 219 B.R. at 24 (the most modest interest or relationship will undo a person's disinterestedness if it "would even faintly color the independence and impartial attitude required by the Code and Bankruptcy Rules.") (internal quotations and citations omitted); MF Global, 464 B.R. at 600 (the trend in determining disinterestedness "focuses on the concerns of divided loyalties and affected judgments") (citations omitted).

### The Protection of the Integrity of the Bankruptcy System Requires Vacateur of Appointment Orders of and Disgorgement of Fees from Ms. Ball and her advisors.

> [C]onsistent with the statutory requirement for receiving "reasonable compensation" and with the common-law standards of fiduciary duty, examiners owe the creditors and shareholders a duty of loyalty. In imposing this duty on examiners and trustees, bankruptcy law "seeks to avoid such delicate inquiries . . . into the conduct of its own appointees by exacting from them forbearance of all opportunities to advance self-interest." Mosser v. Darrow, 341 U.S. 267, 271, 71 S.Ct. 680, 95 L.Ed. 927 (1951). See G. Bogert, Law of Trusts and Trustees § 543 (rev.2d ed. 2003) (trustees "must display throughout the administration of the [case] complete loyalty to the interests of [the creditors and shareholders] and must exclude all selfish interest"); Collier ¶ 1108.09[1] ("[A] chapter 11 trustee, like the trustee of a conventional personal trust, owes single-minded devotion to the interests of those on whose behalf the trustee acts.").
>
> In Big River

Disclosure "goes to the heart of the integrity of the bankruptcy system, of counsel and of the courts." B.E.S. Concrete, 93 B.R. at 236. The duty to disclose mandated by Bankruptcy Rule 2014, therefore, is considered sacrosanct because the complete and candid disclosure by a professional seeking employment is indispensable to the court's discharge of its duty to assure the professional's eligibility for employment under Section 327, and to make an informed decision on whether the engagement is in the best interest of the estate. See Leslie Fay, 175 B.R. at 533; see also eToys, 331 B.R. at 189 (the duty to disclose is considered sacrosanct because the complete and candid disclosure of

a professional seeking retention under Section 327 is indispensable to court's discharge of its duty to ensure eligibility); see generally 9 Collier ¶ 2014.03.

## The Court, Pursuant to Fed. R. Civ. P. 60(b)(6) and 60(d)(3), Made Applicable by Fed. R. Bankr. P. 9024, Should Vacate the Retention Orders of Luskin and Goldin

Subsections (b)(6) and (d)(3) of Civil Rule 60, as made applicable herein by Bankruptcy Rule 9024, authorize the Court to vacate the retention orders of Luskin and Goldin. Fed. R. Civ. P. 60(b)(6) and (d)(3). Rule 60 confers broad discretion upon the Court to grant the requested relief because, as in these cases, to do so will serve substantial justice and maintain the integrity of the Court. See Matarese, 801 F.2d at 106; see also Nemaizer, 793 F.2d at 61 (same); Enron, 352 B.R. at 369 (these grounds "should be liberally construed when substantial justice will . . . be served") (quoting Radack, 318 F.2d at 542); Teligent, 326 B.R. at 227; AMC Realty, 270 B.R. at 143-44.

## The Court Should Order the Removal of Ms. Ball as Chapter 11 Trustee, Jones Day as Trustee Counsel, and Kinetic as Financial Advisor and Order Disgorgment of all Fees

The Soundview Fiduciaries owe "a duty of undivided and undiluted loyalty to those whose interests the fiduciary is to protect. Birnbaum v. Birnbaum, 73 N.Y.2d 461, 466 (1989). As Justice Cardozo articulated in Meinhard v. Salmon, "A trustee is held to something stricter than the morals of the market place. Not honesty alone but the punctilio of an honor the most sensitive, is then the standard of behavior." Meinhard v. Salmon, 249 N.Y. 458, 463-64 (1928).

The facts detailed above demonstrate that Ms. Ball did not meet this high standard. From the beginning of this case, Ms. Ball failed to disclose material connections to Fletcher V Dakota which quantifiably damaged the FILB estate. Accordingly, the Appellant requests that the Court remove Ms. Ball as Trustee and, for the reasons above, order that Ms. Ball should disgorge all compensation she has received from the estate. For similar reasons, Jones Day and Kinetic should be removed as fiduciaries.

## Continuing Misrepresentations by the Fiduciaries

On September 24, 2014, counsel to the Soundview Trustee wrote to the Court requesting that the Fletcher appeal be combined with the separate appeal by Mr. Muho. That letter contained materially

misleading statements and was yet another example of the Fiduciaries efforts to defraud the Court.. The Fletcher Joinder was limited to two requests: to remove the Trustee and to deny dismissal of the bankruptcy cases. The Joinder cited the Trustee's prohibited adverse interests (Bankruptcy Code 327) and undisclosed connections (Bankruptcy Rule 2014) with parties accused of unlawful discrimination and retaliation against the estates the Trustee serves.

Mr. Muho's appeal is separate because the Trustee and Fletcher both objected to Mr. Muho's primary request, to "Dismiss this Action." That motion to dismiss was denied by the Bankruptcy Court. Mr. Hine's letter misrepresented the Fletcher Joinder and the Court's order in claiming:

- *Fletcher filed a so-called "Joinder in Part in the Chapter 11 Trustee's **Objection to the Motion to Remove Chapter 11 Trustee,** Dismiss this Action, and Other and Further Relief."* (emphasis added)

- *the Bankruptcy Court found also that the Fletcher Joinder was improperly made, and … refused to rule on it.*

In fact, the Bankrtupcy Court's order did not declare the Fletcher Joinder improper and the Joinder did not join in the Trustee's objection to the Motion to remove the Trustee. The Bankruptcy Court's order (Docket no. 306), denied the Muho Motion "in each of its respects" included the part joined by Fletcher which the order properly cited as:

"Alphonse Fletcher ,Jr.'s Joinder In Part In The Chapter 11 Trustee's Objection To The Motion To Dismiss **And In The Muho Motion To Remove The Chapter 11 Trustee** (Docket No. 302)." (emphasis added)

Contrary to Mr. Hine's claim that the Joinder "merely joined in the Trustee's objection" and "contained no affirmative request for relief," in fact, the Joinder requests that the Trustee "be disqualified" and "be replaced:"

"A trustee, attorney, or financial advisor representing a debtor-in-possession while also representing a party-in-interest, even in unrelated matters, **must be disqualified**. "[W]hen such client has an interest adverse to the estate, then such attorney is no longer considered disinterested."[30] If the professional sought to be employed does not satisfy this standard, the Code prohibits the court from authorizing his or her employment. "Section 327 does not allow these limitations to be excused by waiver."[31] **The Trustee should be replaces [*sic*]** and Mr. Muho should not be granted control of the Debtors."

## CONCLUSION

As courts have observed on multiple occasions, and recently *In re GSC Group Inc*., the bankruptcy system is self-policing. It is not the responsibility of the United States Trustee, the Court, or other interested parties to discern gaps in the disclosures provided, or to ferret out every last piece of information that may not have been disclosed completely. In essence, the bankruptcy system relies upon the integrity of professionals appearing in bankruptcy cases to make forthright, complete and candid disclosures to fulfill the spirit of the Bankruptcy Code, even where the professionals know that making these disclosures may result in a court's determination that they may not be retained in the case. This determination is for the courts to decide, and not the professionals themselves, especially in this case with allegations of malicious and unlawful threats and retaliation from influential parties. For the reasons stated in this brief, I respectfully request that the court issue an order directing the disgorgement of all compensation received by the Soundview Fiduciaries and disqualify them, and vacate their appointments. Given the seriousness of these transgressions, the Court should also stay any further proceedings and order other appropriate relief.

Dated:  October 7, 2014

Respectfully submitted by

Alphonse Fletcher, Jr
188 Minna Street
San Francisco, CA 94105
Phone: (415)702-0070
AFletcher@Fletcher.com

**Endnotes**

[1] On February 1, 2011, Fletcher Asset Management, Inc. and Alphonse Fletcher, Jr. filed a lawsuit against the Dakota entitled: *ALPHONSE FLETCHER, JR., AND FLETCHER ASSET MANAGEMENT, INC. V. THE DAKOTA INC BRU.CE BARNES, PAMELA LOVINGER, PETER NITZE, JOHN R YDZEiVSKI, AND ANTHONY R. SMITH AND GAEL SMITH ARNOLD AS CO EXEC-UTORS OF THE ESTATE OF RUTH PROSKA UER SMITH*(II-IOI289).(" *Fletcher* v *Dakota* ")Among its claims were defamation and retaliation in violation of New York City Administrative Law 8-107 *et* seq."24 relating to the Dakota's efforts "to harm and destroy the personal and business reputation of plaintiffs; and, on information and belief, to intimidate Fletcher and FAM into dropping this lawsuit... Fletcher Asset Management, Inc. and I seek "not less than $50 million" and "an order enjoining the Dakota and Barnes from continuing to engage in discriminatory conduct with respect to Fletcher" or "interfering with or impeding in any way..."

In 2012, the Appellate Division, First Department affirmed Justice Rakower s substantial denial of the Dakota defendants' motion-to-dismiss. With Associate Justice Rolando T. Acosta's opinion, the court sought to "clear up an element of possible confusion" and confirms the lack of "a safe harbor from judicial inquiry for directors who are alleged to have engaged in conduct not protected by the business judgment rule." Fletcher v. Dakota, Inc., 99 A.D.3d 43, 52 n.2 (1st Dep't 2012)

From 2007 through 2010, my defense of current and prospective Dakota shareholders against their discriminatory conduct led former presidents John Rydzewski and Bruce Barnes to threaten to use the Dakota's "influence" to cause harm to our investment business and ultimately to my family.

Specifically, they spread lies throughout the media that FAM is not profitable, that it is highly leveraged, and that its capital is being depleted. These more recent acts of defamation were consistent with Defendant Barnes' threat to Fletcher in June 2010 that if Fletcher went ahead and vindicated his rights by fling this lawsuit, the Board would do everything in its power to destroy Fletcher and his reputation in the business community.

*Fletcher* v *Dakota,* Amended Complaint, Paragraph 7

[D]efendant Barnes specifically threatened that if Fletcher ultimately brought a lawsuit against the Dakota, "what the Dakota will say will cause [Fletcher] far more harm than any harm caused to the Dakota." Given defendants' recent conduct, and Barnes' recent machinations, defendants have at least tried to carry out this threat.... Defendant Barnes made similar statements regarding plaintiff at other points between May and September 2010. For example, on September 5, 2010, Barnes told another Dakota shareholder that the Dakota would, among other things, make public statements attacking Fletcher, his financial health, and his business if Fletcher brought a lawsuit.

*Fletcher* v *Dakota,* Amended Complaint, Paragraph 113

[2] Excerpt of July 22, 2011 agreement between the Louisiana Officials on behalf of three pension funds and Fletcher Asset Management, Inc. on behalf of its affiliates.
3. Except as otherwise provided in this letter agreement, the Confidential Information will not, without the prior written consent of FAM, be disclosed in whole or in part by the Pension Plans or any representative or affiliate of the Pension Plans, to any person, **including without limitation, the Dakota co-op board, Quinn Emanuel Urquhart & Sullivan, LLP,** or any other representative of record for the Dakota co-op board in the litigation titled Alphonse Fletcher Jr. and Fletcher Asset Management Inc. v. The Dakota Inc. et, al., filed in the Supreme Court of the State of New York, **or to any director, officer, member, partner, associate, employee or any other affiliate or person related to such entities** (each a "Dakota Party" and, collectively, the **"Dakota Parties"** ). The Confidential Information provided during the on-site review will not be copied, photographed, or otherwise duplicated or removed from FAM's New York City offices, in whole or in part, except to the extent that such Confidential Information is referenced in the report by Mr. Stockstill to the Board of Directors of each Pension Fund.

[3] Letter of September 19, 2011 from Mr. Marc E. Kasowitz to *Wall Street Journal* editors:

> I write concerning the *Wall Street Journal's* reporting about Fletcher Asset Management ("FAM") and Denis Kiely in the August 30, 2011 article entitled "Video Reveals Fletcher's
>
> Funds Claims." The article purports to describe statements made by Mr. Kiely during a March 12, 2008 meeting with representatives of the Firefighters Retirement System of Louisiana
>
> ("FRS") concerning a potential investment by FRS in FAM's FIA Leveraged Fund. The article mischaracterizes certain of Mr. Kiely's statements and creates the false impression that FAM and Mr. Kiely were guaranteeing FRS's proposed investment.
>
> Indeed, the reporters purport to quote an exchange between Mr. Kiely and an unidentified FRS representative that never occurred. According to the article, Mr. Kiely "was asked if there was a guarantee, and he answered 'yes,' adding 12%." This exchange never happened. While your reporters may suggest that this is an amalgamation of phrases uttered during a lengthy meeting, the fact is that the exchange as reported never took place. If you believe we are mistaken, we invite you to provide us with the videotape time-stamp at the point in the meeting during which this reported exchange took place...

[4] The Louisiana Officials' wind up petition was argued by Campbells, co-counsel to Quinn Emanuel, and personal counsel to the Cayman Islands Chief Justice who presided over the wind up petition, granted the petitions despite the disputed debt, and granted the request to appoint Ernst & Young as liquidators despite Ernst & Young having worked for the the Louisiana officials for previous nine months.

[5] Minutes of the Firefighters' Retirement System June 14, 2012 Board Meeting show on page 14: "MOTION: Mr. Birdwell moved to authorize the strategy of seeking liquidation of all funds in the FAM silo within the liquidation budget previously approved by the board at its meeting held on May 23, 2012. Mayor Durbin seconded. The motion passed." (www.lafirefightersret.com).

[6] Letter of September 6, 2012 from Mr. Marc E. Kasowitz to Mr. John Van Der Tuin, Esq. of Balber, Pickard, Maldonado & Van Der Tuin, PC with copies to Ms. Christine H. Chung of Quinn Emanuel and Mr. Milton Williams of Vladeck Waldman.

[7] Citco is the founder of the funds, the 15% indirect owner of the funds' investment advisor, and was the funds' administrator.[42] Citco was represented by Paul Weiss in the Soundview proceedings.

[8] The timing of the Registrar's action, a few days after the Soundview chapter 11 filing preempted the Cayman winding up proceedings, and the irregularity of not favoring a trial on the merits struck some as vindictive.

[9] Paul Weiss cleared conflicts, drafted the original complaint in *Fletcher v Dakota*, and managed the case for more than six months. Paul Weiss did not appear in court and selected another law firm to appear in its place. Paul Weiss explained that its managing partner would not allow the firm to appear in this case because John Angelo's Angelo, Gordon & Co. is an "important" client of Paul Weiss.

[10] In brief, the report repeats allegations which the Angelo/Dakota Parties have been making since 2010. It falsely claims that Fletcher International, Ltd. was insolvent since 2008, made not a single profitable investment during the past few years, carrying investments at grossly inflated valuations, and made investments that were authorized by its governing documents. Judge Gerber permitted the Soundview Soundview Debtors' to insert a supplement which provided evidence of the falsity of the Trustee's claims. In brief, the Soundview supplement referred to evidence of several independent parties the confirmed that Fletcher International, Ltd. in fact profitably sold investments and realized profits of approximately $150 million over the past few years pursuing the investment strategies described in its governing documents.

[11] Mr. Varga did not disclose his advise to Young Conaway relating to the Fletcher International, Ltd. case or Young Conaway's August 20, 2012 "independent fiduciary" proposal to this Court: "a gentleman named Geoff Varga, who's from a company called KineticPartners"[3]s as one of the candidates.

[12] "Kinetic goes 'zombie' hunting" in a July 23, 2012 Pension and Investments article.[37]

[13] The US Trustee is an officer of the Department of Justice under the authority of the United States Trustee Program. The United States Trustee Program seeks to promote the efficiency and protect the integrity of the Federal bankruptcy system. The primary role of the U.S. Trustee Program is to serve as the "watchdog over the bankruptcy process." As stated in the USTP Mission Statement:

> "The mission of the United States Trustee Program is to promote the integrity and efficiency of the bankruptcy system for the benefit of all stakeholders – debtors, creditors, and the public"[2]."
> *See United States Trustee Program Mission Statement*

[14] Docket No. 481: Motion to Compel /Motion of Alphonse Fletcher, Jr. to Compel Compliance with Bankruptcy Code and Rules in re Fletcher International, Ltd and Associated Cases filed by Alphonse Fletcher Jr. with hearing to be held on 4/2/2014 at 09:45 AM at Courtroom 523 (REG). (Ho, Amanda) (Entered: 03/26/2014)

[15] On February 1, 2011, Fletcher Asset Management, Inc. and Alphonse Fletcher, Jr. filed a lawsuit against the Dakota entitled: *ALPHONSE FLETCHER, JR., AND FLETCHER ASSETMANAGEMENT, INC. V. THE DAKOTA INC BRU.CE BARNES, PAMELA LOVINGER, PETER NITZE, JOHN R YDZEiVSKI, AND ANTHONY R. SMITH AND GAEL SMITH ARNOLD AS CO EXEC-UTORS OF THE ESTATE OF RUTH PROSKA UER SMITH(II-IOI289).(" FletchervDakota* ")Among its claims were defamation and retaliation in violation of New York City Administrative Law 8-107 *et* seq."[24] relating to the Dakota's efforts "to harm and destroy the personal and business reputation of plaintiffs; and, on information and belief, to intimidate Fletcher and FAM into dropping this lawsuit... Fletcher Asset Management, Inc. and I seek "not less than $50 million" and "an order enjoining the Dakota and Barnes from continuing to engage in discriminatory conduct with respect to Fletcher" or "interfering with or impeding in any way..."

In 2012, the Appellate Division, First Department affirmed Justice Rakower s substantial denial of the Dakota defendants' motion-to-dismiss. With Associate Justice Rolando T. Acosta's opinion, the court sought to "clear up an element of possible confusion" and confirms the lack of "a safe harbor from judicial inquiry for directors who are alleged to have engaged in conduct not protected by the business judgment rule." Fletcher v. Dakota, Inc., 99 A.D.3d 43, 52 n.2 (1st Dep't 2012)

From 2007 through 2010, my defense of current and prospective Dakota shareholders against their discriminatory conduct led former presidents John Rydzewski and Bruce Barnes to threaten to use the Dakota's "influence" to cause harm to our investment business and ultimately to my family.

Specifically, they spread lies throughout the media that FAM is not profitable, that it is highly leveraged, and that its capital is being depleted. These more recent acts of defamation were consistent with Defendant Barnes' threat to Fletcher in June 2010 that if Fletcher went ahead and vindicated his rights by fling this lawsuit, the Board would do everything in its power to destroy Fletcher and his reputation in the business community.

*Fletcher* v *Dakota,* Amended Complaint, Paragraph 7

[D]efendant Barnes specifically threatened that if Fletcher ultimately brought a lawsuit against the Dakota, "what the Dakota will say will cause [Fletcher] far more harm than any harm caused to the Dakota." Given defendants' recent conduct, and Barnes' recent machinations, defendants have at least tried to carry out this threat.... Defendant Barnes made similar statements regarding plaintiff at other points between May and September 2010. For example, on September 5, 2010, Barnes told another Dakota shareholder that the Dakota would, among other things, make public statements attacking Fletcher, his financial health, and his business if Fletcher brought a lawsuit.

*Fletcher* v *Dakota,* Amended Complaint, Paragraph 113

[16] MF Global, 464 B.R. at 600 (citations omitted)

[17] *Fletcher* v *Dakota,* Amended Complaint, Paragraph 7

[18] Id. at 536 (citing In re Rusty Jones, Inc., 134 Bankr. 321, 345 (Bankr. N.D. Ill. 1991) and In re Arlan's Dep't Stores, Inc., 615 F.2d 925, 932 (2d Cir. 1979)).

[19] Leslie Fay, 175 B.R. 525; Granite Partners., 219 B.R. 22.

[20] Id. at 536 (citing In re Rusty Jones, Inc., 134 Bankr. 321, 345 (Bankr. N.D. Ill. 1991) and In re Arlan's Dep't Stores, Inc., 615 F.2d 925, 932 (2d Cir. 1979)).

[21] Id. at 537. Ultimately, Judge Brozman found that, because Leslie Fay was at a critical juncture in its reorganization efforts, "it might not be able to withstand" the delay caused by having to retain new counsel. Therefore, she allowed Weil to remain as counsel to the debtors, but ordered it to pay the $800,000 cost of the examiner's report, as well the expenses the creditors incurred in challenging Weil's impartiality. Id. at 539.

[22] Granite Partners, 219 B.R. 22.

[23] Judge Bernstein also considered the examiner's conclusion that Willkie discharged its investigative duties in a thoroughly professional manner and, in fact, had provided exceptional services which were valuable to the estate. Ultimately, the court held that Willkie was not entitled to any of its fees for investigative services because of the taint caused by its relationships with Merrill, PWC and other broker-dealers – potential targets of the investigation. The court further disallowed 15% of Willkie's fees charged for non-investigative work and ordered it to pay the cost of the examiner's investigation. The court also ordered the Trustee to pay $50,000 to the estate as a sanction for his failure to disclose Willkie's connections. Id. at 41-44.

[24] Section 1107(a) of the Bankruptcy Code gives the debtor in possession the rights and powers of a chapter 11 trustee and also imposes on the debtor in possession most of the obligations of a trustee. 11 U.S.C. § 1107(a).

[25] The Bankruptcy Code defines "person" to include individuals, partnerships and corporations. See 11 U.S.C. § 101(41).

[26] The local rules of this Court require additional disclosures, including ". . . the specific facts showing the reasonableness of the terms and conditions of the employment, including the terms of any retainer, hourly fee, or contingent fee arrangement." LBR 2014-1.

[27] The administrative orders of this Court also require a certification from the professional designated by the applicant with the responsibilities for complying with the Amended Guidelines. Admin. Order M-389 at 1

[28] Rule 9024 sets forth certain exceptions that are not applicable here

[29] Civil Rule 60(c)(1) requires that motions under Civil Rule 60(b) be made within a reasonable period of time and, for subsections (1), (2) and (3), no more than a year after the entry of the judgment or order or the date of the proceeding. Fed. R. Civ. P. 60(c)(1).

[30] *In re Environdyne Industries, Inc.* 150 B.R. 1008 (Bankr. N.D. Ill. 1993)

[31] *In re Amdura,* 121 B.R. 862, 866 (Bankr.D.Colo.1990).