UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#
DATE FILED: 12-29-14

------------------------------------------------------- X

In re
SOUNDVIEW ELITE LTD., et al.,

                      Debtors,

Bankruptcy No.
13-13098 (REG)
(Jointly Administered)

-------------------------------------------------------X

ALPHONSE FLETCHER, JR.,

                      Appellant,

14-CV-7666 (JPO)

-v-

CORINNE BALL, as Chapter 11 Trustee of
SOUNDVIEW ELITE LTD.,

                      Appellee.

**<u>Oral Argument Requested</u>**

-------------------------------------------------------X

## MOTION FOR RECONSIDERATION OR REARGUMENT OF ORDER <u>AFFIRMING THE BANKRUPTCY COURT'S DECISION OF AUGUST 7, 2014</u>

**PLEASE TAKE NOTICE** that, upon this Motion to the Court, dated December 26, 2014, and the accompanying Memorandum of Law, appellant Alphonse Fletcher, Jr., ("Appellant"), proceeding *pro se,* moves this Court requesting the Honorable J. Paul Oetken, United States District Judge, for an order, pursuant to Federal Rules of Civil Procedure 54(b) and 59(e) and Local Rule 6.3, for reconsideration of this Court's December 11, Opinion and Order (the "Order") affirming the Bankruptcy Court's Decision of August 7, 2014.

**PLEASE TAKE FURTHER NOTICE** that papers in opposition to this motion, if any, shall be served, pursuant to Local Civil Rule 6.1(b), within fourteen (14) days of service of the papers for this motion.

Dated: San Diego, California
December 26, 2014

                      ALPHONSE FLETCHER, JR., *pro se*
                      By: */s/ Alphonse Fletcher, Jr.*
                         Alphonse Fletcher, Jr.
                         afletcher@fletcher.com
                         Appellant
                         188 Minna Street
                         San Francisco, CA 94105

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- X

In re
SOUNDVIEW ELITE LTD., et al.,

                      Debtors,

Bankruptcy No.
13-13098 (REG)
(Jointly Administered)

-------------------------------------------------------X

ALPHONSE FLETCHER, JR.,

                      Appellant,

14-CV-7666 (JPO)

             -v-

CORINNE BALL, as Chapter 11 Trustee of
SOUNDVIEW ELITE LTD.,

**Oral Argument Requested**

                      Appellee.

-------------------------------------------------------X

## MEMORANDUM OF LAW OF ALPHONSE FLETCHER, JR., IN SUPPORT OF MOTION FOR RECONSIDERATION OR REARGUMENT OF ORDER AFFIRMING THE BANKRUPTCY COURT'S DECISION OF AUGUST 7, 2014

ALPHONSE FLETCHER, JR., *pro se*
Alphonse Fletcher, Jr.
afletcher@fletcher.com
Appellant
188 Minna Street
San Francisco, CA 94105

1

# Table of Contents

**PRELIMINARY STATEMENT 4**

**ARGUMENT 6**

I.  STANDARD OF REVIEW 6

II.  THE ORDER ERRONEOUSLY STATES THAT FLETCHER FAILED TO SHOW HOW HIS "PERSONAL" CONFLICT IS RELEVANT WHEN THE FACTS DEMONSTRATE THAT THE CONFLICT IS BUSINESS AND CENTRAL TO THESE AFFILIATED AND ASSOCIATED CHAPTER 11 CASES. 6

III.  COURT MISUNDERSTOOD THE RECORD IN PART DUE TO THE MISLEADING LETTER SUBMITTED BY THE TRUSTEE 7

    A.  The Court was misled by the Trustee's false statements. 7

    B.  The Order incorrectly accepted the Trustee's assertion that the Bankruptcy Court did not rule on Fletcher's request and applied the Bankruptcy Court's Ruling with respect to Appellant Muho's arguments. 10

    C.  The Court incorrectly stated that "Fletcher's "vague and unsupported" allegations "failed to show how the interests involved in his personal conflict with the co-op board are relevant to the interests of the Debtors and Creditors in this case," however, Fletcher offers substantial support for his specific allegations of threats and adverse actions against his businesses including the estates in these associated cases. 12

IV.  THE ORDER FAILED TO FOLLOW APPLICABLE LAW AS A) THE COURT MAY NOT ALLOW A FIDUCIARY TO SERVE WHILE BURDENED WITH A CONFLICT RESULTING FROM REPRESENTATION OF AN ADVERSARY OF THE ESTATE AND B) A FIDUCIARY'S FAILURE TO DISCLOSE SUCH CONFLICTS IS FRAUD 14

    A.  Neither the Bankruptcy Court nor the District Court, once put on notice, has the power to disregard conflicts resulting from the Fiduciaries' representation of parties adverse to the estates. 14

    B.  The Order erroneously concluded that Fletcher made no "showing of fraud [or] actual injury" however under applicable law, the failure of a fiduciary to disclose is fraud and the Court need not wait for that fiduciary to cause further harm by acting under the burden of conflicts. 16

**CONCLUSION 21**

**Footnotes from excerpts: 22**

Appellant Alphonse Fletcher, Jr., respectfully submits this memorandum of law in support of his motion, pursuant to FED. R. CIV. P. 54(b) and 59(e) for reconsideration of the Court's December 11, 2014 Order (the "Order") denying his appeal of the Bankruptcy Court's decision of August 7, 2014 decision denying Fletcher's request that the appointment of the *Soundview Elite Ltd. et al* ("Soundview") chapter 11 Trustee ("Trustee") be vacated (the "Decision").

## PRELIMINARY STATEMENT

The Order should be reconsidered, and Appellant's request to vacate the appointment of Trustee should be granted, because the Order ignores applicable law in a) impermissibly allowing a chapter 11 trustee, her counsel, and her financial advisor (the "Fiduciaries") to serve a chapter 11 estates while holding interests adverse to those estates due the Fiduciaries' representation of direct adversaries of those estates and b) disregarding the fraud and other harms that result from the fiduciaries' failure to disclose those conflicts.

Further, the Order failed to balance the lack of prejudice to Appellee resulting from Appellants' brief delay (of a few hours -- less than one full day) in filings its Opening Brief by versus the significance of relevant public policies issues such as the integrity of the bankruptcy system, legal ethics, and the enforcement of anti-retliation civil rights law.

The Order also states grounds on which the Bankruptcy Court "rejected Fletcher's argument" but the record contradicts that statement and the Appellee argued that the

Bankruptcy Court "refused to rule" on Fletcher's request. The reasons stated in the Order are reasons offered by the Bankruptcy Court for the rejection of another appellant's arguments. The record shows that the Bankruptcy Court's stated one "problem" with Fletcher's argument is one not found in Federal Rules of Bankruptcy Procedure nor in the Order.

Ultimately, in addition to the meritorious arguments regarding procedure, neither the Bankruptcy Court nor the District Court has the power to disregard the brazen conflicts-of-interest that exist in this case. No fiduciary can be permitted to serve estates when those fiduciaries' other clients have long been accused of vicious discrimination and retaliation against those estates.

As unlikely and unlawful as such a coincidence is, **each**[1] of the fiduciaries in these associated cases represents the parties that have been coordinating unlawful retaliation against Appellant Fletcher and his affiliates including the estates in these affiliates cases as payback for his opposition of discrimination.[2]

---

[1] Dkt. No. 481. Motion to Compel /*Motion of Alphonse Fletcher, Jr. to Compel*

[2] In *"Fletcher v Dakota,"* an action for retaliation, defamation, discrimination, and other torts brought by Appellant Fletcher and an affiliate, the Supreme Court of the State of New York, Appellate Division, First Department, dismissed defendants' motion to dismiss on July 3, 2012, Acosta, J. Fletcher v. The Dakota, Inc., 99 A.D.3d 43, 54-56 (1st Dep't 2012)

## ARGUMENT

### I.    STANDARD OF REVIEW

Reconsideration is proper where "the Court has overlooked factual matters or controlling precedent that were presented to it on the underlying motion and that would have changed its decision." Tardd v. Brookhaven Nat. Lab., 2007 WL 1423642, at *2 (E.D.N.Y. May 8, 2007) (quoting In re Worldcom, Inc. Sec. Litig., 308 F. Supp. 2d 214, 224 (S.D.N.Y. 2004)). See also Local Rule 6.3. A "major ground[] justifying reconsideration [is] . . . the need to correct a clear error or prevent manifest injustice." Glory Wealth Shipping Serv. Ltd. v. Five Ocean Corp. Ltd., 571 F. Supp. 2d 542, 544 (S.D.N.Y. 2008) (citations omitted).

### II.   THE ORDER ERRONEOUSLY STATES THAT FLETCHER FAILED TO SHOW HOW HIS "PERSONAL" CONFLICT IS RELEVANT WHEN THE FACTS DEMONSTRATE THAT THE CONFLICT IS BUSINESS AND CENTRAL TO THESE AFFILIATED AND ASSOCIATED CHAPTER 11 CASES.

The Order states that Fletcher failed to show how his "personal" conflict was relevant to the interests of the estate, however, the record shows that threats to Fletcher's businesses, the very businesses that are the subjects of these affiliated and associated chapter 11 cases.

> *More fundamentally, Fletcher has failed to show how the interests involved in his personal conflict with the co-op board are relevant to the interests of the Debtors and Creditors in this case.6*

The Fletcher Opening Brief demonstrated how the personal **and**

**professional** conflict between parties associated with a co-op board, on the one hand, and Fletcher and his affiliated funds, on the other. The Fletcher Opening Brief contained at least 11 references to those parties' vows and efforts to "destroy" Fletcher and his affiliates. See for example, the opening paragraph of the attached *Fletcher Opening Brief*:

> "The Soundveiw Fiduciaries, however, hid and even denied representations of and connections to the estate's primary adversaries, parties associated with defendants in a civil rights lawsuit1 who vowed to "destroy" the plaintiffs and their affiliates including Sounview Elite, Fletcher International, Ltd., and related funds."

The Fletcher Opening Brief detailed specific acts by those parties and cited multiple documents that provided further detail including the Fletcher March 21st Motion to Compel Fiduciaries to Comply with Bankruptcy Rules.

### III. COURT MISUNDERSTOOD THE RECORD IN PART DUE TO THE MISLEADING LETTER SUBMITTED BY THE TRUSTEE

**A.** <u>**The Court was misled by the Trustee's false statements.**</u>

The Fletcher Reply of September 25, 2014 ("Fletcher Reply") objected to false statements in the Trustee's September 24, 2014 letter ("Trustee's Letter"). When the Fletcher Reply did not appear on the docket, Fletcher inquired with the Court Clerk's office that told him the letter might be in the judge's chambers.[3]

---

[3] The Trustee's counsel, as an officer of the court, should have brought the

The Trustee's Letter misled the Court and the Trustee's counsel owed a duty to the Court to bring Fletcher's reply to the Court's attention. The Trustee's letter's misstatements appear to have contributed directly to incorrect conclusions in the Order. The Fletcher Reply follows:

> Dear Judge Furman and Judge Oetken:
>
> I respectfully write to Your Honors to correct certain statements in the September 24, 2014 letter from Mr. Hine, counsel to the chapter 11 Trustee in these cases. The Joinder I filed was limited to two requests: to remove the Trustee and to deny dismissal of the bankruptcy cases. The Joinder cited the Trustee's prohibited adverse interests (Bankruptcy Code 327) and undisclosed connections (Bankruptcy Rule 2014) with parties accused of unlawful discrimination and retaliation against the estates the Trustee serves.
>
> Mr. Muho's appeal is separate because the Trustee and I both objected to his primary request, to "Dismiss this Action," which was denied. Mr, Hine's letter misrepresented my Joinder and the Court's order in claiming:
>
> • Fletcher filed a so-called "Joinder in Part in the Chapter 11 Trustee's **Objection to the Motion to Remove Chapter 11 Trustee,** Dismiss this Action, and Other and Further Relief."
>
> • the Bankruptcy Court found also that the Fletcher Joinder was improperly made, and …refused to rule on it.
>
> In fact, the order did not declare the Joinder improper and the Joinder did not join in the Trustee's objection to the Motion to remove the Trustee. The Bankruptcy Court's order (Docket no. 306), denied the

Fletcher Reply to the attention of the court. No prejudice resulted from Fletcher, who was proceeding *pro se,* filing his brief within hours (less than one full day) of the filing deadline requested by the Jones Day Trustee in a letter containing false statements. That letter was accepted by the District Court without reference to or acknowledgement of Fletcher's reply to the trustee's letter. Fletcher's reply had not been added to the docket. When Fletcher inquired with the Court clerk's office, he was told that the letter might be in the judge's chambers.

Muho Motion "in each of its respects" included the part joined by me
which the order properly cited as:

> "Alphonse Fletcher ,Jr.'s Joinder In Part In The Chapter 11
> Trustee's Objection To The Motion To Dismiss **And In The Muho
> Motion To Remove The Chapter 11 Trustee** (Docket No. 302)."

Contrary to Mr. Hine's claim that the Joinder "merely joined in
the Trustee's objection" and "contained no affirmative request for relief,"
the Joinder requests that the Trustee "be disqualified" and "be
replaced:"

> "A trustee, attorney, or financial advisor representing a debtor-in-
> possession while also representing a party-in-interest, even in
> unrelated matters, **must be disqualified.** "[W]hen such client has
> an interest adverse to the estate, then such attorney is no longer
> considered disinterested."- If the professional sought to be
> employed does not satisfy this standard, the Code prohibits the
> court from authorizing his or her employment. "Section 327 does
> not allow these limitations to be excused by waiver."- **The Trustee
> should be replaces [sic] and Mr. Muho should not be granted
> control of the Debtors.**"

Respectfully and sincerely,
/s/ Alphonse Fletcher, Jr.
Alphonse Fletcher, Jr., pro se
cc:    Mr. Hine and Mr. Muho


The Order stated that "He did not apply for an extension of time," however,

Fletcher submitted a letter with his brief which read:

> Dear Judge Oetken,
>
> I respectfully write to Your Honor to follow up on my letter of September
> 24, 2014 which I noticed did not appear on the docket. Attached is a copy
> of that letter which was delivered to the pro se office on September 24,
> 2014.
>
> Also, please accept the attached brief which I prepared pro se. I
> understand that your recent order granting the trustee's requests required
> my brief to be delivered yesterday. I respectfully request that Your Honor
> accept my brief despite that brief delay and despite other infirmities which
> may result from my proceeding without counsel. I will correct anything
> errors that Your Honor directs.

*Respectfully and sincerely submitted,*

*Alphonse Fletcher, Jr.*

The Trustee's Letter also claimed that the Bankruptcy Court "refused to rule" on Fletcher's requests. The Trustee's letter requested and was granted the combination of two separate appeals and a schedule for briefing apparently without consideration given to Fletcher's reply. The Trustee's Letter falsely reported to the District Court that Fletcher "merely joined in the Trustee's objection" and Fletcher made "no affirmative request for relief."

B. **The Order incorrectly accepted the Trustee's assertion that the Bankruptcy Court did not rule on Fletcher's request and applied the Bankruptcy Court's Ruling with respect to Appellant Muho's arguments.**

The Order stated: "The Bankruptcy Court rejected [Fletcher's] argument on the ground that it is barred by the doctrines of laches, law of the case, and collateral estoppel." The District Court cited the reasons that the Bankruptcy Court rejected Muho's argument and erroneously stated that the Bankruptcy Court rejected Fletcher's argument for those reasons referring to pages 18 and 19 of the hearing transcript at Docket No. 307.

In fact, the Bankruptcy Court cited "law of the case" in rejecting Muho's argument and affirming Fletcher's position that the chapter 11 filings were *bona fide.*

> *Turning first to law of the case, I previously ruled that this case was properly filed. And I did that in a written opinion and I did it based on uncontested facts that the people who based on affidavits shown to me at*

> the time had the authority to file the case which at the time were Mr.
> Fletcher and Mr. Ladner, if I am not mistaken, had done so.
>
> Now the liquidators had differed with that conclusion but I ruled on it and
> that issue is behind us. *I expressly gave Mr. Muho an opportunity to be
> heard on the law of the case finding and while he said certain things,
> none of it went to the law of the case.*

Transcript Docket No. 307, page 17

Second, in rejecting Mr. Muho's arguments, the Bankruptcy Court stated:

**"Then we turn to <u>laches</u> which is probably the strongest reason for both
not dismissing the case and denial of the motion to dismiss the trustee
because this case has gone on for months..."** While Mr. Muho had been
absent from the proceedings during those months, Fletcher, acting largely *pro se*
due to unjustified restrictions over the cash of the entities he serves, had
appeared and tried to oppose wrongful acts of the Fiduciaries. The Order, on
page 6, refers to Fletcher's prior efforts: "See In re Soundview Elite Ltd., 512
B.R. 155, 159 (S.D.N.Y. Apr. 23, 2014) (dismissing the appeal due to Fletcher s
failure to timely file a notice of appeal)."

Third, the Bankruptcy court noted that Mr. Muho had not addressed its
concerns regarding the third factor: **"And then we have the <u>collateral estoppel</u>
issues to which once again Mr. Muho did not respond."**

The Bankruptcy Court identified a fourth, separate factor as "the real
problem" and it was not the doctrines of laches, law of the case, or collateral
estoppel. The Bankruptcy Court identified as "the real problem I have with your
position, Mr. Muho, and to a lesser extent but still to Mr. Fletcher's Joinder is that

when you're the target of an action taken by a trustee, you can't target the guy or woman who is acting on behalf of the estate who is going after you."

With respect to this one reason offered by the Bankruptcy Court against Fletcher's arguments, nothing in Federal Rules of Bankruptcy Procedure or the Chapter 11 of the Code allows Fiduciaries to escape their duties by making allegations against those who expose the Fiduciaries' wrongdoing.

C. **The Court incorrectly stated that "Fletcher's "vague and unsupported" allegations "failed to show how the interests involved in his personal conflict with the co-op board are relevant to the interests of the Debtors and Creditors in this case," however, Fletcher offers substantial support for his specific allegations of threats and adverse actions against his businesses including the estates in these associated cases.**

The Order concludes that Fletcher argues that Ball should be removed because she is not a disinterested party; in so arguing, however, he alleges **only vague and unsupported "connections"** between Ball and the law firm she is employed by, Jones Day, and various **parties he is personally in conflict with** in a civil action brought by him against a Manhattan co-op board. (Fletcher, Dkt. No. 17, at 7-9.)

The Fletcher Opening Brief (Dkt. No. 17) makes specific allegations that Jones Day **fraudulently hid its "connections" in violation of Bankruptcy Rule 2014**, a "fraud" that the SDNY Courts' have concluded is sufficient for removal (see for example: in re GSC). The Fletcher Opening Brief supports those allegations with references to Jones Day's sworn disclosure filings in other cases. (See Brief and its references to Fletcher's attached March 21 Motion to

Compel Fiduciaries' Compliance, and, for example, their **specific citation of connections revealed in "Applications to Employ Jones Day in In re Tribune Company 08-13141 (KJC), In re AMR Corporation 11-15463 (SHL), In re Lehman Holdings Inc ,et al. 08-13.555 (JMP"))**

## IV. THE ORDER FAILED TO FOLLOW APPLICABLE LAW AS A) THE COURT MAY NOT ALLOW A FIDUCIARY TO SERVE WHILE BURDENED WITH A CONFLICT RESULTING FROM REPRESENTATION OF AN ADVERSARY OF THE ESTATE AND B) A FIDUCIARY'S FAILURE TO DISCLOSE SUCH CONFLICTS IS FRAUD

### A. Neither the Bankruptcy Court nor the District Court, once put on notice, has the power to disregard conflicts resulting from the Fiduciaries' representation of parties adverse to the estates.

Fletcher's Opening Brief states:

And the courts in this district and federal rules place the burden on the Fiduciaries to prove their independence in the face of connections rather than place that burden on parties-in-interest, the US Trustee, or the Court (though each has a duty to report such attorney misconduct). *Fletcher Opening Brief, page 18:*

> *"Courts in this circuit consistently hold that it is the duty of the professional, and not the court, to make sure that "all connections" have been disclosed. In Fibermark, the court opined: It is not the duty of the court, the U.S. Trustee or any other party to search beyond the 2014(a) disclosure for the existence of connections that a professional seeking to be employed should have disclosed. Full disclosure of all connections to a party in interest is the affirmative duty placed on the professional seeking employment. The duty to disclose all possible connections is so vital to the bankruptcy process that failure to do so is an independent basis for the disallowance of fees. In re Fibermark, Inc., No. 04-10463, 2006 WL 723495, at \*9 (Bankr. D. Vt. Mar. 11, 2006) (citing Futuronics Corp. v. Arutt, Nachamie and Benjamin (In re Futuronics Corp.), 655 F.2d 463, 469 (2d Cir. 1981); In the Matter of Arlan's Dep't Stores, Inc., 615 F.2d 925, 933 (2d Cir. 1979)) (additional citations omitted); see also Leslie Fay, 175 B.R. at 533 (same); In re Source Enters., Inc., No. 06-11707 (AJG), 2008 WL 850229, at \*8 (Bankr. S.D.N.Y. Mar. 27, 2008) (same); In re Matco Elecs. Group, Inc., 383 B.R. 848, 853-54 (Bankr. N.D.N.Y. 2008) ("Fed. R. Bankr. P. 2014 is not intended to condone a game of cat and mouse, where the professional seeking appointment provides only enough disclosure to whet the appetite of the UST, the court or other parties in interest, and then the burden shifts to those entities to make inquiry in an effort to expand the disclosure."); Granite Partners,*

*219 B.R. at 35 (the court "should not have to rummage through files or conduct independent fact finding investigations" to determine if the professional is disqualified.) (quotations omitted)."*

The Order states: "The trustee contends that Fletcher's appeal should be dismissed because he failed to timely file and serve his briefs. The Court agrees...he was required to file his brief by **October 6**, 2014. He failed to do so."

No party, however, was prejudiced by **a delay of hours (not days and not even a full day) beyond Midnight October 6, 2014.** The 32-page *pro se* Fletcher Opening Brief was filed on October 7, the next day, by delivering a physical copy delivered to the clerk since Fletcher had not yet been granted permission to file electronically.

While corporate affiliates of Fletcher have a stake in this matter they were unable to join Fletcher's efforts because they and he unable to obtain the assistance of counsel due to the obstruction of their access to their funds without legal justification. With the benefit of counsel would come significantly better compliance with procedure but justice should be not be abandoned as a result of draconian punishments where no harm has been done by slight delays.

Fletcher's September 26th reply to the Jones Day trustee's letter requesting that the appeals be combined with a modified schedule was never posted to the docket and did not receive a response. When Fletcher followed up, the clerk's office suggested patience because the letter "might be in

chambers." Fletcher waited then proceeded to file his brief.

This delay, measured in hours not days, should be excused given the
**issues of public importance at stake: unlawful retaliation against civil
rights plaintiffs, legal ethics, and violations of disclosure and
independence requirements under bankruptcy law and rules.**

> **B.** <u>The Order erroneously concluded that Fletcher made no "showing of
> fraud [or] actual injury" however under applicable law, the failure of a
> fiduciary to disclose is fraud and the Court need not wait for that
> fiduciary to cause further harm by acting under the burden of conflicts.</u>

The Order concluded that Fletcher "has failed to make an
adequate showing of fraud, let alone actual injury to the Debtors from Ball s
position as trustee." In fact, page 21 of the Fletcher Opening Brief directly and
specifically accuses the Jones Day trustee and counsel of "fraud" for their failure
to disclose connections, as described in Fletcher's Opening Brief and above, in
violation of Bankruptcy rule 2014 and cites case law.

> *"In fact, willful nondisclosure of relationships in connection with the
> retention of professionals may rise to the level of a fraud upon the
> See Pearson v. First NH Mort. Corp., 200 F.3d 30, 35-41 (1st Cir. 1999);
> see also Crivello, 134 F.3d at 836-37 (stating that "a bankruptcy court
> should punish a willful failure to disclose the connections required by Fed.
> R. Bankr. P. 2014 as severely as an attempt to put forth a fraud on the
> court."); accord In re ACandS, Inc., 297 B.R. 395, 405 (Bankr. D. Del.
> 2003) (disallowing nunc pro tunc retention and ordering disgorgement of
> all fees of professional which willfully concealed relationships and
> potential and actual conflicts)."*

The Order notes that "Grounds for disapproval or removal of a trustee in
bankruptcy are not to be found in his formal relationships. 'We have traditionally
stressed the elements of fraud and actual injury to the debtor's interests.'" In re

Freeport Italian Bakery, Inc., 340 F.2d 50, 54 (2d Cir. 1965) (quoting Schwartz v. Mills, 192 F.2d 727, 729 (2d Cir. 1951)). Such grounds and even fraud are found, however, in willful failure to disclose such relationships when relevant.

The Order concludes with "Finally, Fletcher's argument as to why Trustee Ball should be removed fails on its merits. Section 324(a) of the Bankruptcy Code provides that the Bankruptcy Court "may remove a trustee, other than the United States Trustee, or an examiner, for cause, 11 U.S.C. g 324(a)." and erroneously states that Fletcher failed to show adverse interests:

> *Fletcher also alleges that the professionals employed by Trustee Ball in this case — specifically, the counsel and financial advisor — are not disinterested because they have relationships with parties associated with Fletcher's dispute with the Manhattan co-op board. The relationships he alleges as to these parties, however, are equally attenuated and unsupported as are the relationships he alleges as to Ball. Moreover, he has not shown, as he must, that these parties "hold or represent[] interest[s] adverse to the estate," 11 U.S.C. 327(a) (emphasis added), and that these interests are relevant to the issues involved in the bankruptcy proceeding, In re AroChem Corp., 176 F.3d 610, 625 (2d Cir. 1999) (" Most important, [] appellants have failed to offer any evidence that any potential claims against [counsel retained by the trustee] are relevant to the matters to be litigated in the [action before the court], so as to create an interest that is adverse to the Estates with respect to that action.")."* Order, Page 8

The Fletcher Opening Brief quotes controlling case law that specifies the low threshold of disqualification of general counsel and other central fiduciaries under Code section 327(a) (and even under the inapposite 327(c) standard used for "special counsel" and fiduciaries whose work is limited to certain matters as in the above-referenced Arochem Case).

In the Fletcher Opening Brief on page 7:

> "*Courts in this district have held that the disinterestedness requirement mandates that a person "should be divested of any scintilla of personal interest which might be reflected in his decision concerning estate matters." Vebeliunas, 231 B.R. 191-92 (citations and quotations omitted); see also Granite Partners, 219 B.R. at 24 (the most modest interest or relationship will undo a person's disinterestedness if it "would even faintly color the independence and impartial attitude required by the Code and Bankruptcy Rules.") (internal quotations and citations omitted); MF Global, 464 B.R. at 600 (the trend in determining disinterestedness "focuses on the concerns of divided loyalties and affected judgments") (citations omitted)."*

The Fletcher Opening Brief details the Fiduciaries' connections with the Dakota Board, including attorneys with duties to and compensation from board members and their companies, and various shared interests.  Thus according to the case law, the Fiduciaries a) should have disclosed those connections and b) can be disqualified for their failure to disclose those connections.

> "*Each of the court-appointed fiduciaries serving Soundview Elite et al represented to the Court that it had "disclose[d] all facts" and connections that "would even faintly color the independence and impartial attitude required by the Code and Bankruptcy Rules." The disclosed and undisclosed connections described to the Bankruptcy Court and described below, however, including connections to parties related to the defendants in Fletcher v Dakota,15 a race discrimination-retaliation case Alphonse Fletcher filed in 2011, reveal "divided loyalties and affected judgments."16 Fiduciaries with connections to such parties could have interests "consistent with Defendant Barnes' threat to Fletcher in June 2010 that if Fletcher went ahead and vindicated his rights by filing this lawsuit, the [Dakota] Board would do everything in its power to destroy Fletcher and his reputation in the business community."17 Fletcher Opening Brief, Page 9*

The Fletcher Opening Brief cites the Fletcher March 21st Motion to Compel Fiduciaries' Compliance which details the Fiduciaries' unlawful transfer of value from the estate to parties connected to the Fiduciaries and the Dakota:

*These undisclosed connections and interests adverse to the estates cast
doubt on the major decisions of the Trustee, specifically, related to the
proposed settlement of the four primary disputes that led to these
associated insolvency cases. Those settlements would provide relatively
little or no consideration to the estate or create liabilities.*

*1. the estate's important claims against JPMorgan-supported United
Community Banks would be settled for an unreasonably small fraction of
the Trustee's artificially low "maximum" value (a figure which itself is a
fraction of the true "maximum" value which exceeds $100 million and is
comparable to the increase in United's market capitalization following its
announcement of the settlement ).*

*2. the Ernst & Young Liquidators would settle the litigation that Fletcher
International, Ltd. brought against the Ernst & Young Liquidators for
harms they caused awarding them most of the Fletcher International, Ltd.
estate despite their valid prior redemption and their reckless settlement of
their redemption securities while rejecting higher bids by other creditors
and refusing to get court approval.39*

*3. Credit Suisse would be released even though it seized and sold the
estate's Ion Geophysical convertible preferred stock to D.E. Shaw for
millions below a more attractive alternative bid, which D.E. Shaw resold
for millions above the small premium charged by Credit Suisse.
(Separately, litigation against the Ion Geophysical was mismanaged and
settled for nominal amounts. )*

*4. the Louisiana Officials, purported "major parties-in-interest,"40 would
share in the estate despite violating several agreements with the Fletcher
funds and causing substantial damage through misuse of legal
proceedings.*

*All of these proceedings and litigation began [when] the parties affiliated
with the Dakota, in an effort to escalate its unlawful retaliation against
me, retained Quinn in 2010 to target our Cayman funds. The Quinn
partner had no discrimination experience but was actively working on a
multi-billion dollar Cayman Island wind up with Geoffrey Varga of
Kinetic and others now involved in these cases. Working with Quinn's
outside counsel, Gregory P. Joseph41 in multiple jurisdictions,42 the
Louisiana Officials, obtained in the Cayman Islands what they could not
inthe U.S. Quinn's co-counsel, Ross McDonough of Cayman Island law
firm Campbells, represented the Louisiana Officials. Rather than litigating
to resolve the redemption which they disputed, the Louisiana Officials
filed a bad faith "wind up petition," the equivalent of an involuntary
bankruptcy petition.43*

Mr. McDonough represented the Louisiana Officials in front of the Cayman Islands Chief Justice who granted their petition. Mr. McDonough also represents the Chief Justice, as his personal counsel, which would disqualify a judge44 from hearing cases argued by that lawyer under U.S. legal system. Mr. McDonough has represented the Chief Justice for years in, among other things, a mystery involving anonymous letters to the editor of a Cayman Newspaper45 that were critical of the Chief Justice. The Independent describes the controversy as "attempts to pervert the course of justice over a Watergate-style break-in at a newspaper office on the islands, according to documents seen by The Independent on Sunday."46,47Under "circumstances that might appear strange to those accustomed to the U.S. legal system,"48 Mr. McDonough argues in front of the Chief Justice. This is especially true considering the Foreign and Commonwealth Office49 justifies its refusal to release the allegations against the Chief Justice and others because:

"We judge that disclosure of the information requested could lead to a loss of confidence within the international community, which could impact negatively on the Cayman Islands reputation and, more directly, on its financial servicesindustry."50

Irregularities, however, have been observed from the start of Fletcher v Dakota. In particular, the influence of John Angelo has been felt as exemplified by his connections to Fiduciaries in these associated cases and involvement in our legal representation. Our former counsel Paul Weiss and Kasowitz, for example, each has long represented Angelo Gordon and its partners including News Corporation. In early 2011, Paul Weiss cleared conflicts, drafted the original complaint in Fletcher v Dakota, managed our case for more than six months, and was paid more than $1 million. Yet Paul Weiss refused to appear in court or sign its filings, had another law firm appear in its place, and continued to manage the case "behind the scenes." Paul Weiss explained that its managing partner would not allow the firm to appear in this case because John Angelo's Angelo, Gordon & Co. is an "important" client of Paul Weiss. Paul Weiss resigned in July 2011 and one week later News Corporation announced its hiring of Paul Weiss for help with its "Hacking Scandal." A few weeks after Kasowitz replaced Paul Weiss, Quinn invited Kasowitz to serve as its co-counsel in the Federal Home Finance Agency cases seeking hundreds of billions of dollars of damages against the major investment banks.51 In 2013, both Paul Weiss and Kasowitz appeared in the Soundview proceedings without my consent as their former client.52 There are many other examples involving interference in offshore proceedings, media, government investigations, and business relationships.

## CONCLUSION

Based on the foregoing, Appellant respectfully request that the Court reconsider its Order and either vacate the appointment of the Soundview chapter11 fiduciaries or order an evidentiary hearing to address the conflicts highlighted in the record.

Dated: San Diego, California
December 26, 2014

ALPHONSE FLETCHER, JR., *pro se*
By: */s/ Alphonse Fletcher, Jr.*
Alphonse Fletcher, Jr.
afletcher@fletcher.com
Appellant
188 Minna Street
San Francisco, CA 94105

**Footnotes from excerpts:**

[15] On February 1, 2011, Fletcher Asset Management, Inc. and Alphonse Fletcher, Jr. filed a lawsuit against the Dakota entitled: *ALPHONSE FLETCHER, JR., AND FLETCHER ASSETMANAGEMENT, INC. V. THE DAKOTA INC BRU.CE BARNES, PAMELA LOVINGER, PETER NITZE, JOHN R YDZEiVSKI, AND ANTHONY R. SMITH AND GAEL SMITH ARNOLD AS CO EXEC-UTORS OF THE ESTATE OF RUTH PROSKA UER SMITH*(II-IOI289)/(" *FletchervDakota* ")Among its claims were defamation and retaliation in violation of New York City Administrative Law 8-107 *et* seq."24 relating to the Dakota's efforts "to harm and destroy the personal and business reputation of plaintiffs; and, on information and belief, to intimidate Fletcher and FAM into dropping this lawsuit... Fletcher Asset Management, Inc. and I seek "not less than $50 million" and "an order enjoining the Dakota and Barnes from continuing to engage in discriminatory conduct with respect to Fletcher" or "interfering with or impeding in any way..."

In 2012, the Appellate Division, First Department affirmed Justice Rakower s substantial denial of the Dakota defendants' motion-to-dismiss. With Associate Justice Rolando T. Acosta's opinion, the court sought to "clear up an element of possible confusion" and confirms the lack of "a safe harbor from judicial inquiry for directors who are alleged to have engaged in conduct not protected by the business judgment rule." Fletcher v. Dakota, Inc., 99 A.D.3d 43, 52 n.2 (1st Dep't 2012)

From 2007 through 2010, my defense of current and prospective Dakota shareholders against their discriminatory conduct led former presidents John Rydzewski and Bruce Barnes to threaten to use the Dakota's "influence" to cause harm to our investment business and ultimately to my family.

Specifically, they spread lies throughout the media that FAM is not profitable, that it is highly leveraged, and that its capital is being depleted. These more recent acts of defamation were consistent with Defendant Barnes' threat to Fletcher in June 2010 that if Fletcher went ahead and vindicated his rights by fling this lawsuit, the Board would do everything in its power to destroy Fletcher and his reputation in the business community.

*Fletcher* v *Dakota,* Amended Complaint, Paragraph 7

[D]efendant Barnes specifically threatened that if Fletcher ultimately brought a lawsuit against the Dakota, "what the Dakota will say will

cause [Fletcher] far more harm than any harm caused to the Dakota." Given defendants' recent conduct, and Barnes' recent machinations, defendants have at least tried to carry out this threat.... Defendant Barnes made similar statements regarding plaintiff at other points between May and September 2010. For example, on September 5, 2010, Barnes told another Dakota shareholder that the Dakota would, among other things, make public statements attacking Fletcher, his financial health, and his business if Fletcher brought a lawsuit.

*Fletcher* v *Dakota,* Amended Complaint, Paragraph 113

[16] MF Global, 464 B.R. at 600 (citations omitted)

[17] *Fletcher* v *Dakota,* Amended Complaint, Paragraph 7
39 The Ernst k, Young Liquidators refused to consider the Soundview funds' offer to pay more than twice that amount to purchase the position. They also refused Soundview's request that they seek Cayman Court approval. In his April 3, 2013 email to Cayman counsel for Soundview and Richcourt funds, Robert McMahon, one of the Ernst k, Young Liquidators, declared:

As it is not necessary, we will not be pursuing court sanction in Cayman of the mediation settlement. Additionally, the settlement you refer to has been agreed to by all members of the liquidation committee of FIA Leveraged Fund (in Official Liquidation) who represent the majority of creditors of the fund. With regard to the settlement amount and settlement agreement, we have authorized the Trustee, Richard Davis to share this with the New York attorneys for Richcourt Holdings, Weil, Gotshal.

*In re* Soundview*Elite, Ltd ,et* al., Case No. 13-13098(REG),SUPPLEMENTAL DIRECT TESTIMONY AFFIDAVIT OF ALPHONSE FLETCHER, JR. ON MOTION'S TO DISMISS CONVERT OR APPOINT A TRUSTEE, December 11, 2013

Email from Robert McMahon to Cherry Bridges, April 3, 2013, "re — Richcourt Holding Inc."

40 The Verified Petition in support of chapter 15 recognition for FIA Leveraged Fund does not state the current ownership of the stakeholders even though it is required by Rule 1007(a)(4). Instead the Ernst k Young Liquidators inserted a reference to 2012 ownership information:

I certify that the equity ownership of FIA Leveraged Fund (in Liquidation) (" Leveraged" ) as reported in Leveraged's records is as follows: Leveraged — Estimated capital balances as at 13th April 2012 Provided by the Directors of Leveraged... Note 1 — Names redacted as it is an offence in the Cayman Islands to release investor names without an order of the Cayman Court

pursuant to the Confidential Relationships Preservation Law

Similarly, none of the Ernst k, Young Liquidators, their counsel, the Louisiana pension funds, their counsel, nor any of the Soundview parties appear to have filed disclosure required by Bankruptcy Rule 2019. Rule 2019 requires "a verified statement setting forth the information specified in subdivision (c) of this rule shall be filed by every group or committee that consists of or represents, and every entity that represents, multiple creditors or equity security holders that are (A) acting in concert to advance their common interests, and (B) not composed entirely of affiliates or insiders of one another."

Bankruptcy Rule 2019(b)(1); Represent" or "represents" means to take a position before the court or to solicit votes regarding the confirmation of a plan on behalf of another. [2019 (a)(2)]; "Disclosable economic interest" means any claim, interest, pledge, lien, option, participation, derivative instrument, or any other right or derivative right granting the holder an economic interest that is affected by the value, acquisition, or disposition of a claim or interest. [Rule 2019(a)(1)].

41 The Louisiana Officials had signed a confidentiality agreement on July 22, 2011 in which they agreed not to share Fletcher information with the Dakota, Quinn Emanuel, or any of their representatives. Paragraph 3:

Except as otherwise provided in this letter agreement, the Confidential Information will not, without the prior written consent of FAM, be disclosed in whole or in part by the Pension Plans or any representative or affiliate of the Pension Plans, to any person, including without limitation, the Dakota co-op board, Quinn Emanuel Urquhart k Sullivan, LLP, or any other representative of record for the Dakota co-op board in the litigation titled Alphonse Fletcher Jr. and Fletcher Asset Management Inc. v. The Dakota Inc. et, al., filed in the Supreme Court of the State of New York,or to any director, officer, member, partner, associate, employee or any other affiliate or person related to such entities (each a "Dakota Party" and, collectively, the "Dakota Parties" ).

42 Quinn Emanuel's outside counsel, Gregory P. Joseph, informed Fletcher counsel in early 2012 that he represented the Louisiana officials. Mr. Joseph proposed that the Fletcher Funds enter into an agreement through which Mr. Joseph would also represent the Fletcher Funds. The agreement would provide Mr. Joseph with authority to manage the litigation against United Community Banks with respect to the entire United Option. The agreement would also release Mr. Joseph from any liability for the outcome of that litigation and waiver any conflicts to permit him to represent the Louisiana officials in any future litigation against the Fletcher Funds, Management, or their affiliates. Fletcher counsel informed him that our first requirement was that any

agreement must prohibit any collusion with the Dakota Parties as the
Louisiana officials had previously agreed in the July 22, 2011 confidentiality
agreement. Mr. Joseph did not pursue the representation after that request.

Mr. Joseph s firm then re-appeared on April 25 with a demand letter on behalf
of the Louisiana officials relating to the shares of FILB Co-Investments, LLC.
Then Mr. Joseph's firm appeared again on or about June 15, representing the
Ernst & Young Joint Official Liquidators. He next appeared on June 27
representing FILB Co-Investments. Eventually on February 27, 2013, Mr.
Joseph represented each of Leveraged, FILB Co-Investments, LLC, the three
Louisiana pension funds, and the Ernst & Young Liquidators in settling the
litigation with respect the portion of the United Option representing 18 million
shares.

It may not be true that, as the Ernst & Young Liquidators attested, "The
Leveraged Foreign Proceeding pending under Cause No. 13 of 2012 in the
Grand Court of the Cayman Islands, and the provisions made thereunder for
the protection, administration and distribution of assets pursuant to the
Liquidation Order, is a Foreign Proceeding pursuant to 11 U.S.c. $ 101(23).
All significant activities, including the settlement of the most important asset
held by those estates appears to have been directed from the U.S. under the
orchestration of Quinn Emanuel s outside counsel in consultation with, among
other U.S. parties, the FIA Leveraged Fund Liquidation Committee,
composed entirely of U.S. persons operating from the U.S. According to the
Ernst &, Young Liquidators' most recent report, their payments to Quinn's
Outside Counsel,

"Greg Joseph (US NY UCBI) 604,365 JOLs legal advisors in relation to
FILCBI litigation/ mediation" *[sic]* and other US counsel have exceeded their
payments to Cayman counsel. Evidencing the breadth of his responsibility,
Mr. Joseph appears to have represented FIA Leveraged Fund, Fletcher Income
Arbitrage Fund, FIAL SPV I, FILB Co-Investments, LLC, the three Louisiana
pension funds, and the Ernst & Young Joint Official Liquidators. His broad
role has been necessary because, as the Ernst & Young Liquidators' report
states: "the JOLs have been faced with many complex multi-jurisdictional
issues to consider and tackle. As such the JOLs have employed the services of
a number of legal professionals in
differentjurisdictionandwithdifferentspecialism's." *[sic]*

*43 Stonegate Securities Ltd* v *Gregory:*"The whole of the doctrine of this part
of the law is based upon the view that winding up proceedings are not suitable
proceedings in which to determine a genuine dispute about whether the
company does or does not owe the sum in question"

*Mann* v *Goldstein:*"It would be an abuse of process to ask for a winding up
petition when a debt was bona fide under dispute."

*Tallington Lakes Ltd* v *South Eesteven District Council* Lord Justice:I have to
emphasise, however... that it is well established that the threshold for
establishing that a debt is disputed on substantial grounds in the context of a
winding up petition is not a high one for restraining the presentation of the
winding up petition, and may be reached even if, on an application for
summary judgment, the defence could be regarded as "shadowy".'

44 28 U.S. Code ) 455(a), In re Cargill, 66 F.3d 1256 (1st Cir. 1995) (htt
s://bulk. resource. or /courts. ov/ f c/recusal. df)

The disqualification requirement of section 455(a) is triggered, despite the
lack of any actual bias on the judge's part, if a reasonable person, knowing all
the circumstances, would question the judge's impartiality. See Liljeberg v.
Health Servs. Acquisition Corp., 486 U.S. 847, 861-62, 108 S.Ct. 2194, 2203-
04, 100 L.Ed.2d 855 (1988). Most observers would agree that a judge should
not hear a case argued by an attorney who, at the same time, is representing
the judge in a personal matter. See 13A Charles Wright, Arthur Miller k
Edward Cooper, Federal Practice and Procedure Sec. 3549, at 614 (1984)
(citing cases). Although the appearance of partiality is attenuated when the
lawyer appearing before the judge is a member of the same law firm as the
judge's personal counsel, but not the same individual, many of the same
cautionary factors are still in play. See, e.g., 2 Administrative Office of the
U.S. Courts, Guide to Judiciary Policies and Procedures V-32 (1995)
(expressing the view that "where an attorney-client relationship exists between
the judge and the lawyer whose law firm appears in the case, the judge should
recuse absent remittal"). This principle would seem to have particular force
where, as here, the law firm is small and the judge's lawyer is a name partner

45 In Paragraph 18 of his April 18, 2012 opinion that granted the winding up
petition, the Chief Justice writes:

[T]he Investment Manager appears to be the subject of an investigation by
both the U.S. Securities Exchange Commission and the U.S. Federal Bureau
of Investigation. This last assertion of the Petition relies on newspaper reports
of the investigations mentioned and the Company...

*The Independent,* "Corruption and the FCI: Blue skies, white sand, dark
clouds," May 26, 2013, Paul Peachey (www.ind endent.co.uk)

47 Cayman Net News, "Tempura becomes Cayman's Watergate," May 31,
2013 ht://ca mannetnews.com/2013/05/31/tempura-becomes-caymans-
watergate/

48 In re: PERRY H. KOPLIK & SONS, INC., Case No. 02-B-40648 (REG),
MICHAEL S. FOX, as Litigation Trustee of PERRY H. KOPLIK & SONS,
INC. v MICHAEL KOPLIK and ALVIN SIEGEL, Adv. Pro. 04-02490

(REG), March 30, 2012

"The Court finds as a fact that these expenditures were nevertheless a reasonable exercise of business judgment. The Debtor s claim against Bank Mandiri was, at the least, a very strong one. When the merits of the suit were considered, the Debtor won once in the trial court, and then again in the Indonesian Supreme Court, until a decision by the latter was vacated, under circumstances that might appear strange to those accustomed to the U.S. legal system.196"

Footnote 196

As described in the Comity Decision, the Indonesian District Court of Surabaya, where the Debtor first filed suit, ruled that the Letter of Credit was binding, and ordered Bank Mandiri to pay Koplik the $5.3 million. Bank Mandiri then appealed to the Indonesian High Court (an intermediate appellate court), which, on September 11, 2000, "cancelled' the District Court's decision. The Debtor then appealed the High Court s decision to the Indonesian Supreme Court, Indonesia s highest court. In a decision dated May 30, 2002 (the "First Indonesia Supreme Court Decision" ), the Indonesia Supreme Court reinstated the District Court s decision, enforcing the Letter of Credit. By a procedure that was not clear to this Court when it issued the Comity Decision (and still isn t), Bank Mandiri then obtained further review by the Indonesia Supreme Court of the First Indonesia Supreme Court Decision. In a decision dated September 29, 2003 (the "Second Indonesia Supreme Court Decision" ), the Indonesia Supreme Court vacated its earlier decision enforcing the Letter of Credit, on the stated ground that the power of attorney that the Debtor had issued to permit Willendra to sue had not been satisfactorily "legalized." The power of attorney had to be acknowledged before a notary, and the Debtor had done so. But the acknowledgment of the power of attorney was lacking a second level of authentication, to be issued by the Indonesian Consul in New York. The failure to provide this second level of authentication similar or identical to what New York practitioners refer to colloquially as a "notarial flag," which would attest to the fact that the notary was, in fact, a notary resulted in Koplik s inability to recover on a $5.3 million letter of credit that the Indonesia Supreme Court had just ruled, in the First Indonesia Supreme Court Decision, should be enforced. See 357 B.R. at 235-36 &, n.2.

49 In re: PERRY H. KOPLIK &, SONS, INC., Case No. 02-B-40648 (REG), MICHAEL S. FOX, as Litigation Trustee of PERRY H. KOPLIK &, SONS, INC. v MICHAEL KOPLIK and ALVIN SIEGEL, Adv. Pro. 04-02490 (REG), March 30, 2012

"In the action here, this Court found issues of fact as to whether it should grant comity to the Indonesian judgment after, among other things, the Debtor's counsel here introduced a U.S. State Department report detailing

corruption in the Indonesian judiciary.197"

Footnote 197

See id. at 239-241. The Debtor's U.S. counsel also offered 12 newspaper articles detailing corruption in the Indonesian judiciary, which this Court was compelled to exclude as inadmissible hearsay. See id. at 239-240 & nn.ll, 12. See also Gryphon Domestic VI, LLC v. APP Intern. Finance Co., B.V., 41 A.D. 3d 25, 37, 38, 836 N.Y.S.2d 4, 9, 9-10 (1st Dep't 2007) (unwilling to be bound by an Indonesian decree procured by an Indonesian corporation absolving it from the duty to make payment on its bonds, commenting on the "extensive" materials that had been submitted evidencing corruption in the Indonesian legal system).

50 "Cayman Islands: The Met's Caribbean connection, "TUESDAY 01 MAY 2012

*The Independent,* PAUL PEACHEY
http://www.independent.co.uk/news/uk/crime/cayman-islands-the-mets-caribbean-connection-7697811.html

51 The Am Law 100, the Early Numbers: Kasowitz Benson Makes Modest Gains in Revenue, Profits (www.americanlaw er.com )On February 13, 2013, *American Lawyer Daily* attributed Kasowitz Benson s rise in revenue to its FHFA work from Quinn Emanuel: "Kasowitz says his firm is well-positioned to take on such cases as a result of the client conflicts that prevent older, larger New York firms from getting involved: "Along with Quinn, we' re known as a go-to firm for those cases. That practice has been large and continues to grow."

52 Paul Weiss later appeared in the 2013 Soundview chapter 11 proceedings, without my consent, representing Citco Group which was adverse to me and my affiliates the Soundview funds and Fletcher funds. In that proceeding, Kasowitz appeared, without my consent, representing Soundview investor Pasig Ltd. which was also adverse to me and my affiliates. Kasowitz, like most of our counsel, withdrew from our representation shortly after speaking with Richard J. Davis when he appointed chapter 11 trustee of Fletcher International, Ltd. in late 2012. Kasowitz eventually sued me in New York Supreme Court for fees it claimed I owed and filed a third-party complaint against me in response to a suit brought by Fletcher International, Ltd. Trustee Richard Davis in which Kasowitz claims that my privilege with respect to Kasowitz is waived.